# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-1318

LARRY J. LEAF, individually and as personal
representative of the estate of JOHN P. LEAF,
deceased, MARTHA A. LEAF, JOHN P. LEAF, et al.,

*Plaintiffs-Appellees,*

*v.*

RONALD SHELNUTT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 02 C 433—**Larry J. McKinney**, *Chief Judge.*

_____

ARGUED SEPTEMBER 21, 2004—DECIDED MARCH 18, 2005

_____

Before EASTERBROOK, RIPPLE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Early in the morning of May 5, 2001,
Marion County Sheriff's Deputy Ronald Shelnutt shot and
killed John Patrick Leaf. Members of Mr. Leaf's family ("the
Leafs") brought this action pursuant to 42 U.S.C. § 1983 and
Indiana state law for alleged constitutional violations and
other torts arising from this tragic event. The district court
granted in part and denied in part Deputy Shelnutt's motion
for summary judgment. For the reasons set forth in the

following opinion, we now reverse the district court and remand for further proceedings.

## I

## BACKGROUND

### A. Facts

On the night of May 4, 2001, John Patrick Leaf patronized a bar in Indianapolis. When he left the bar, he turned over his keys to a friend and took a taxicab to his home at 8863 Lake Nora West Drive, Apartment B, in the Lake Nora Arms Apartments. When he arrived, he forced entry into his own apartment.

Around 1 a.m. on May 5, Dustin Kersey, Ryan Murphy and Vito Sanders, residents of the Lake Nora Arms Apartments, heard glass breaking in the direction of Mr. Leaf's apartment. The residents called out to see what was happening, and the sounds of glass breaking stopped for a few minutes and then resumed. When the sounds of glass breaking began again, the residents went to investigate. Kersey, Murphy and Sanders arrived at the patio entrance to Mr. Leaf's apartment and saw a man trying to gain entrance to the apartment. Mr. Leaf introduced himself to the residents and explained that he lived in the apartment but did not have his keys. The men had not met Mr. Leaf prior to that night. They talked with Mr. Leaf briefly and then left. Murphy later returned to Mr. Leaf's apartment to make note of the address and then called 911 from his own apartment at 1:10 a.m., but hung up before his call was answered.

That night, Deputy Andrew Jacobs was working for the Meridian Hills Police Department. Deputy Jacobs sometimes served as a special deputy for the Marion County Sheriff's Department and volunteered to respond to the in-

complete 911 call on behalf of that department. Deputy Jacobs responded to the call at Murphy's apartment; he arrived at around 1:22 a.m. Murphy told Deputy Jacobs that the man he had seen breaking a window had claimed to be the occupant of the apartment and had claimed that he did not have his keys. According to Deputy Jacobs, Murphy also said that the man at the apartment had been belligerent. Deputy Jacobs did not know that the residents had shaken hands with Mr. Leaf or that Mr. Leaf had introduced himself. For two or three minutes, Deputy Jacobs spoke with Murphy and the other residents who had seen Mr. Leaf.

Deputy Jacobs then drove to Mr. Leaf's apartment. There, he observed the apartment from outside the fence that enclosed a patio at the back of Mr. Leaf's apartment. Deputy Jacobs noticed that the patio door was open and that a window at the rear of the apartment was broken. He then walked through the fence gate and into the patio area, where he could see that the vertical blinds that hung at the apartment's patio doorway were moving. The blinds, hung inside the apartment, were blowing outside. Deputy Jacobs pushed the blinds aside to look into the apartment. He saw an item, later identified as an ice chest, pushed up against the front door. Deputy Jacobs testified that burglars sometimes will obstruct all entries to a home except those through which they enter and exit.

At that point, Deputy Jacobs called for backup, and Deputy Shelnutt responded. Deputy Jacobs stated in the call that there was an open patio door and a broken window, but did not specifically say that he believed there had been a burglary. He continued to observe the apartment until 1:30 a.m., when Deputy Shelnutt arrived. Deputy Jacobs testified that he told Deputy Shelnutt about the substance of his conversation with the residents—specifically, that

the residents had spoken with the man seen entering the apartment and that they did not know whether that man lived in the apartment.

About one minute after Deputy Shelnutt arrived, the officers entered the apartment. The deputies did not radio to say they would be entering the apartment. In fact, once Deputy Shelnutt responded to Jacobs' call, neither Deputy Jacobs nor Deputy Shelnutt made any radio communications with the police department until they radioed to report that there had been a shooting.

The officers entered the apartment with guns drawn, using the tactical lights attached to the barrels of their guns to illuminate the dark apartment. Neither officer knocked before entering the apartment. However, Deputy Jacobs testified in his deposition that he announced from outside the apartment, "This is the Marion County Sheriff. Come out now. Show yourself. This is the Marion County Sheriff. Come out now. Show yourself." R.147, Ex.7 at 155. Deputy Shelnutt made no announcements. Deputy Jacobs testified that he "could" have said, "Come out and make yourself known," but that he did not "recall" making such an announcement. R.147, Ex.7 at 155. Deputy Jacobs also said that he did not announce that the officers would enter the apartment. Deputy Shelnutt, however, testified at his deposition that he recalled Deputy Jacobs announcing, "We will be searching the apartment." R.147, Ex.13 at 120.

Once the officers entered the apartment, Deputy Shelnutt noticed light coming from the front door, and concluded that, before the front door was secured shut with the ice chest, the front door had been kicked in and the door frame broken. The officers searched the apartment, including the bedroom, where they found Mr. Leaf lying naked and uncovered on his bed, face up, with his eyes closed. Mr. Leaf was breathing deeply. After finding Mr. Leaf on the bed but

before waking him, Deputy Shelnutt conducted a search lasting approximately three minutes, in order to determine whether anyone was hiding; Deputy Jacobs remained in the bedroom. Deputy Shelnutt checked the kitchen, two hall closets, a bedroom closet and a bathroom. In the bedroom, Deputy Shelnutt then approached the bed with his gun drawn and the tactical lights illuminated, in order to awaken Mr. Leaf. It is disputed whether Deputy Shelnutt actually touched Mr. Leaf. Deputy Shelnutt did not "recall" touching Mr. Leaf's shoulder. R.147, Ex.13 at 160. Deputy Jacobs, on the other hand, testified in his deposition that he saw Deputy Shelnutt nudge Mr. Leaf. R.147, Ex.7 at 35, 177.

At this point, the officers claim, Mr. Leaf jumped up from the bed and lunged at Deputy Shelnutt, wielding a 15-inch bowie knife. Deputy Jacobs did not remember which hand Mr. Leaf used to wield the knife, but recalled that Mr. Leaf waved the knife in a "figure eight" motion. R.147, Ex.7 at 178. The officers told Mr. Leaf to drop the knife and shouted, "Sheriff's Department" or "Police." R.147, Ex.7 at 188; R.147, Ex.13 at 177, 178. When Mr. Leaf continued to advance toward Deputy Shelnutt with the knife, Deputy Shelnutt retreated a step or two into the bathroom. Deputy Shelnutt then fired four shots at Mr. Leaf, hitting him three times. Mr. Leaf died from the gunshot wounds.

## B. District Court Proceedings

On February 19, 2002, members of Mr. Leaf's family initiated this action in Indiana state court pursuant to 42 U.S.C. § 1983 and Indiana state law. The Leafs named as defendants Deputies Jacobs and Shelnutt in their individual capacities, as well as Marion County Sheriff Jack Cottey and Meridian Hills Town President Ed Perry in their official capacities. The Leafs alleged that Deputy Shelnutt and Deputy Jacobs

violated Mr. Leaf's rights under the Fourth and Fourteenth Amendments to the Constitution. In particular, the Leafs claimed that the officers had unlawfully searched Mr. Leaf's apartment, that they had unlawfully seized him and that both officers had deprived Mr. Leaf of life, liberty or property without due process of law. The Leafs further asserted that Deputy Shelnutt had used excessive force against Mr. Leaf. They also advanced § 1983 claims for failure to intervene on Mr. Leaf's behalf against both Deputy Shelnutt and Deputy Jacobs.[1] On March 20, 2002, the defendants removed the action to the United States District Court for the Southern District of Indiana.

In a motion filed July 21, 2003, the Leafs sought partial summary judgment from the district court. They contended that the officers had unlawfully seized Mr. Leaf. The officers responded that they did not unlawfully seize Mr. Leaf and asserted qualified immunity as a defense. In an order issued October 14, 2003, the district court denied summary judgment on the question of illegal seizure. The court concluded that Mr. Leaf was seized while lying in his bed. Noting that there was a "factual dispute about whether Shelnutt touched or nudged Leaf . . . in an effort to wake him," R.172 at 4, the district court did not determine whether Deputy Shelnutt touched Mr. Leaf. The court found that the fact that Mr. Leaf

---

[1] The Leafs also alleged claims of deliberate indifference and unconstitutional policy, custom or practice against Sheriff Cottey and Town President Perry. The Leafs asserted additional claims for damages under Indiana law against Deputies Shelnutt and Jacobs for trespass, false arrest, assault and battery and negligent failure to follow Indiana law and the policies and procedures of the Marion County Sheriff's Department, and against Cottey and Perry for negligent hiring, supervision and retention of Deputies Shelnutt and Jacobs.

"did not flee from the officers' show of authority (or physical touching, if one occurred)," R.172 at 7, demonstrated that a seizure had occurred. However, the court denied summary judgment on the grounds that a trier of fact could find that the seizure was "not unreasonable under the circumstances known to the officers at the time," and that a trier of fact could find that "the scope and method of the seizure was reasonable under the circumstances." R.172 at 11-12. The district court did not address the officers' assertion of qualified immunity. In November 2003, the Leafs reached a settlement with Deputy Jacobs, and he was released from the litigation.

On January 24, 2004, the district court granted in part and denied in part a motion for summary judgment made by Sheriff Cottey and Deputy Shelnutt. Because Deputy Shelnutt is the sole appellant in this appeal, we shall discuss the district court's order only as it applies to him.

The district court denied summary judgment on what it called "UNLAWFUL ENTRY AND SEARCH." R.219 at 12. The court determined that exigent circumstances justified the officers' warrantless entry into Mr. Leaf's apartment. However, the court found that the way in which the officers entered may have violated the Constitution. The court explained that the Fourth Amendment requires law enforcement personnel to knock on the door of a private dwelling and to announce both their identity and their purpose before entering. R.219 at 12-14. The district court found that Deputies Shelnutt and Jacobs had announced their presence, but the court found that a question of fact existed as to whether Deputy Jacobs had announced, "We will be searching the apartment," prior to entering. R.219 at 14. The court also found that a question of fact existed regarding whether, once inside the apartment, Deputy Shelnutt behaved in an objectively unreasonable manner by searching the apartment

and not announcing his identity. R.219 at 16-17. Therefore, the district court denied Deputy Shelnutt's motion for summary judgment on the illegal search claims.

The district court also denied summary judgment on the excessive force claim because it could not determine as a matter of law that Mr. Leaf posed a threat of death or serious bodily injury to Deputy Shelnutt. Because the district court found fact issues precluding summary judgment on the claims for illegal search, entry and seizure, it denied Deputy Shelnutt summary judgment on the failure to intervene claim. The district court granted Deputy Shelnutt's motion for summary judgment on the Leafs' due process claim.

The district court then turned to Deputy Shelnutt's assertion of qualified immunity as a defense to "the claims for unlawful entry, search and seizure, and excessive force." R.219 at 25. The district court found that underlying fact issues with respect to those claims[2] prevented the court from determining whether Deputy Shelnutt was entitled to qualified immunity. R.219 at 25. Specifically, the court stated that the "requirement of announcing prior to entry has been clearly established, and a reasonable officer would know that entering without announcing his purpose or intent would violate the Fourth Amendment." R.219 at 25. Thus, a question of fact as to whether the officers had in fact announced their purpose or intent prevented the court from ruling on qualified immunity, "because whether the law was violated depends on which version of the facts the jury believes." R.219 at 25.

---

[2] The district court briefly referred to its October 14, 2003 order, noting that it had addressed the illegal seizure claim and had denied summary judgment because it found "a jury must determine whether Shelnutt's . . . seizure of Leaf while he was in his bed was reasonable." R.172 at 18 n.3.

With respect to Deputy Shelnutt's assertion of qualified immunity for the Leafs' excessive force claim, the district court found that a jury would have to determine whether Mr. Leaf had posed a threat of death or serious harm to Deputy Shelnutt, and whether it was unreasonable for Deputy Shelnutt to take more than one shot at Mr. Leaf; "whether Shelnutt used excessive force is completely de-pendant [sic] on which version of the facts the jury accepts." R.219 at 26. The court cited Seventh Circuit precedents holding that, when an officer creates a dangerous situation by conducting an unreasonable search or seizure, that officer is stripped of qualified immunity against excessive force claims arising from the situation the officer created. R.219 at 26. Therefore, the district court concluded, a jury also was entitled to consider whether Deputy Shelnutt's earlier unreasonable behavior rendered his actions inside the apartment objectively unreasonable. R.219 at 27.[3]

## II

## DISCUSSION

### A.  Standard of Review

This court reviews de novo a district court's denial of summary judgment on qualified immunity grounds. *See Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004). Similarly, the question of whether an asserted federal right was clearly established at the time of a claimed violation is a question of law to be reviewed de novo on appeal. *See Elder*

---

[3] The district court also held that Deputy Shelnutt had state law immunity against the Leafs' claims for trespass, assault and bat-tery and negligence, and granted him summary judgment on those issues.

*v. Holloway*, 510 U.S. 510, 516 (1994). Summary judgment is appropriate when, construing all facts and drawing all inferences in the light most favorable to the nonmoving party, there is no genuine issue of material fact for a jury to decide. *See Sullivan*, 360 F.3d at 696 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-55 (1986)).

## B. Qualified Immunity

### 1. Jurisdiction to Hear an Appeal from the Denial of Qualified Immunity

We pause to address the issue of whether we have jurisdiction to hear an appeal from the denial of qualified immunity because it is a point of extreme conflict between the parties. Ordinarily, a district court's denial of summary judgment is not appealable. *See, e.g., Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995). However, when a district court has denied summary judgment on qualified immunity grounds, an appellate court has jurisdiction to review the denial of qualified immunity to the extent that the denial turns on a question of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). On the other hand, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).

This court may not reconsider the district court's determination that certain genuine issues of fact exist; such determinations are unappealable because they are not "final decisions" within the meaning of 28 U.S.C. § 1291. *See Johnson*, 515 U.S. at 313. Thus, we may not make conclusions about which facts the parties ultimately might be able to establish at trial. Such conclusions concern the "sufficiency

of the evidence" and are not properly before a court of appeals considering the denial of qualified immunity. *See id.*

However, when the outcome of a question of law—for instance, whether a particular action violates the Constitution—does not depend on the outcome of a disputed factual question, we may review whether the district court correctly determined the question of law that it considered. *See Mitchell*, 472 U.S. at 528. These are the "more abstract issues of law" to which an appeal of the denial of qualified immunity properly is limited. *Johnson*, 515 U.S. at 317. When conducting such a review, we "simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Id.* at 319.

A defendant may appeal the denial of qualified immunity with respect to particular claims even when he still will be required to go to trial on a matter separate from the claims for which he asserted qualified immunity. *See Behrens v. Pelletier*, 516 U.S. 299, 311-12 (1996).[4] A plaintiff often seeks relief for a single incident on multiple theories of liability. When this occurs, the defendant does not lose his right to appeal the denial of qualified immunity as to one theory of liability even when he still will be required to go to trial on another theory. As several of our sister circuits have recog-

---

[4] The right to qualified immunity "is a right to immunity *from certain claims*, not from litigation in general; when immunity with respect to those claims has been finally denied, appeal must be available." *Behrens v. Pelletier*, 516 U.S. 299, 312 (1996) (emphasis in original).

nized,[5] the term "claim" must be employed in this context in a manner that is compatible with the unique, yet firmly established, principles established by the Supreme Court with respect to the doctrine of qualified immunity. Consequently, in employing the term "claim" when determining whether a defendant may invoke the defense of qualified immunity, we must keep in mind that qualified immunity is designed to ensure that a defendant does not stand trial unnecessarily on an allegation that lacked a reasonable grounding in established law at the time the act was committed. We also must keep in mind that the defense of qualified immunity is only effective when it is applied at a meaningful level of generality. This requirement ensures that a defendant will have to stand trial only when he could *reasonably* anticipate that *his* conduct may give rise to liability for damages. Defining "claim" in light of these considerations quite naturally produces a different and more narrow definition of the term "claim" than we would encounter in other contexts such as res judicata. There, in determining whether the same "claim" arose in earlier litigation, "claim" has become a surrogate for the term "cause of action," and that term has been defined in turn to include all theories of liability arising out of the same trans-

---

[5] *International Action Center v. United States*, 365 F.3d 20, 23-24 (D.C. Cir. 2004); *Beier v. City of Lewiston*, 354 F.3d 1058, 1063-64 (9th Cir. 2004).

action or occurrence.[6] *See Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 592-94 (7th Cir. 1986).

Any other course would frustrate the Supreme Court's directive that an appeal of the denial of qualified immunity "cannot be foreclosed by the mere addition of other claims to the suit." *See Behrens*, 516 U.S. at 312; *see also id.* ("If the district court rules erroneously, the qualified-immunity right not to be subjected to pretrial proceedings will be eliminated, so long as the plaintiff has alleged (with or without evidence to back it up) violation of one 'clearly established' right . . . ."); *see also International Action Center v. United States*, 365 F.3d 20, 23-24 (D.C. Cir. 2004); *Beier v. City of Lewiston*, 354 F.3d 1058, 1063-64 (9th Cir. 2004) (holding that it would be contrary to *Behrens* if "any plaintiff alleging multiple claims arising under a single constitutional provision would be able to circumvent a qualified immunity appeal as long as one of those claims has some merit").

---

[6] *Cf.* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4402 (2d ed. 2002):

> Foreclosure of matters that never have been litigated has traditionally been expressed by stating that a single "cause of action" cannot be "split" by advancing one part in a first suit and reserving some other part for a later suit. The entire cause of action was said to "merge" in a judgment for the plaintiff, leaving a new cause of action on the judgment, or to be subject to the "bar" of a judgment for the defendant. There is now a growing tendency, spurred by the vigorous advocacy of Allan Vestal, to substitute the word "claim" for the cause of action phrase.

*Id.*

### 2.   The Qualified Immunity Framework

Government officials performing discretionary functions enjoy a qualified immunity from suit.[7] *See Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). Qualified immunity "shield[s] [officers] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 638. When qualified immunity applies, a defendant is not merely entitled to a defense from liability; he is entitled not to stand trial. *See Mitchell*, 472 U.S. at 526.

In determining whether qualified immunity will apply to shield a defendant from suit, a court undertakes a two-part inquiry, *see Saucier v. Katz*, 533 U.S. 194, 200 (2001), to assess "the objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). First, the court must ask the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. As the Supreme Court has pointed out, "to deny summary judgment any time a material issue of fact remains . . . could undermine the goal of qualified immunity." *Id.* at 202. Therefore, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* at 201.

---

[7] Because of the significant policies served by qualified immunity, a court should determine early in the proceedings whether qualified immunity will apply. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994) (noting that "few individuals will enter public service if such service entails the risk of personal liability for one's official decisions").

If the facts alleged make out a constitutional violation, then a court must determine "whether the right was clearly established." *Id.* This inquiry is a specific one: "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted."[8] *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The action's unlawfulness must be "apparent" from pre-existing law. *Id.*

The district court denied Deputy Shelnutt qualified immunity because it found that questions of fact existed respecting four actions that he took on May 5, 2001: (1) his entry into Mr. Leaf's apartment;[9] (2) his subsequent search of Mr. Leaf's apartment; (3) his conduct toward Mr. Leaf while Mr. Leaf was lying on the bed; and (4) the manner in which he shot Mr. Leaf. The district court also denied

---

[8] When determining whether a constitutional right has been violated requires an analysis of the reasonableness of an officer's conduct—for instance, in the Fourth Amendment search context—the reasonableness standard for the constitutional violation is distinct from the qualified immunity standard. *See Anderson v. Creighton*, 483 U.S. 635, 643-44 (1987). Thus, "even if a court were to hold that [an] officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier*, 533 U.S. at 206.

[9] In their complaint, the Leafs did not differentiate between unlawful entry and illegal search; however, the district court in its analysis found questions of fact pertaining to both the entry and the search and denied summary judgment based on both of those questions of fact. Therefore, we address the entry and the ensuing search separately.

Deputy Shelnutt qualified immunity for the excessive force claim on the ground that, because the first three actions listed may have violated Mr. Leaf's constitutional rights, Deputy Shelnutt may have created the need for force in such a way that his ultimate shooting of Mr. Leaf "was tainted by prior unconstitutional acts." *Tom v. Voida*, 963 F.2d 952, 956 (7th Cir. 1992); *see also, e.g., Sledd v. Lindsay*, 102 F.3d 282, 287-88 (7th Cir. 1996); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991).

### C. Deputy Shelnutt's Entry into the Apartment

We first address the question of whether Deputy Shelnutt possesses qualified immunity for his entry into Mr. Leaf's apartment. The district court found that there was a question of fact whether Deputy Shelnutt had announced his purpose before entering the apartment. The district court also determined that the requirement of "announcing prior to entry has been clearly established." R.219 at 25. We respectfully disagree with the conclusion of the district court. The facts of this case, construed in the light most favorable to the Leafs, do not allege a constitutional violation with respect to Deputy Shelnutt's entry. Accordingly, Deputy Shelnutt is entitled to qualified immunity for his entry into Mr. Leaf's apartment and for the manner in which the entry was accomplished.

Taking up the first question in the qualified immunity inquiry, we ask whether the facts, taken in the light most favorable to the Leafs, allege a constitutional violation. *See Saucier*, 533 U.S. at 201. A warrantless entry into a private home constitutes a search and presumptively is unreasonable under the Fourth Amendment. *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir.) (citing *Payton v. New York*, 445 U.S. 573, 585-86 (1980)), *cert. denied*, 534 U.S. 923 (2001).

However, a warrantless search is permissible "when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir.), *cert. denied*, 540 U.S. 841 (2003). For instance, a warrantless search is permitted based on exigent circumstances "when the police 'reasonably fear[] for the safety of someone inside the premises.'" *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) (quoting *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir.), *cert. denied*, 531 U.S. 910 (2000)). To determine whether there were exigent circumstances, we must "analyze the situation from the perspective of the officers at the scene" and must ask whether the officers had "an objectively reasonable belief that exigent circumstances existed." *United States v. Marshall*, 157 F.3d 477, 482 (7th Cir.), *cert. denied*, 525 U.S. 1045 (1998).

Based on these principles, we agree with the district court's analysis of the officers' entry. As the district court pointed out, the broken window and open patio door supported an objectively reasonable belief that a burglary was occurring and that people inside the apartment were in danger. Furthermore, a 911 call had been placed, and, although the call itself was not answered, Deputy Jacobs learned from the caller, Murphy, that a man had been seen forcing entry into the apartment. We have held that a 911 call itself "can be enough to support [a] warrantless search[] under the exigent circumstances exception, particularly where . . . the caller identified himself." *Richardson*, 208 F.3d at 630. Under the circumstances known to them at the time, Deputy Shelnutt and Deputy Jacobs had a reasonable basis to believe that an emergency situation justified a warrantless search of Mr.

Leaf's apartment.[10] Thus, on the record before us, we must conclude that the officers' entry was justified by exigent circumstances.

We next consider whether the officers' entry into Mr. Leaf's apartment was rendered unreasonable as a result of the officers' failure to announce their purpose before entering.

---

[10] The district court did not address whether probable cause existed to justify the officers' entry. The cases on which the district court primarily relied in its analysis of exigent circumstances, *United States v. Jenkins*, 329 F.3d 579 (7th Cir. 2003), and *United States v. Richardson*, 208 F.3d 626 (7th Cir.), *cert. denied*, 531 U.S. 910 (2000), do not address the requirement of probable cause separately from the existence of exigent circumstances. However, other cases of this court do apply the requirement of probable cause even in exigent circumstances. *See, e.g., United States v. Rivera*, 248 F.3d 677, 680 (7th Cir.) (holding that a warrantless search is constitutional "where there is probable cause and exigent circumstances create a compelling need for official action and insufficient time to secure a warrant"), *cert. denied*, 534 U.S. 923 (2001); *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir.) (holding that a warrantless search and seizure inside a home is permitted "when probable cause and exigent circumstances exist"), *cert. denied*, 525 U.S. 1045 (1998); *see also Minnesota v. Olson*, 495 U.S. 91, 100 (1990) ("[T]here must be at least probable cause to believe that [exigent circumstances] were present . . . ."). Circumstances constituting probable cause may include the reasonable belief "that illegal activity is being conducted in a particular place." *Jacobs v. City of Chicago*, 215 F.3d 758, 769 (7th Cir. 2000). On the record in this case, we must conclude that the circumstances known to the officers at the time also gave them probable cause to conduct a warrantless search of Mr. Leaf's apartment.

The common law "knock and announce" principle,[11] which requires a law enforcement officer "to announce his presence and authority" before opening the doors of a dwelling and entering,[12] "forms a part of the reasonableness inquiry under the Fourth Amendment." *Wilson v. Arkansas*, 514 U.S.

---

[11] A federal "knock and announce" statute permits a federal officer executing a warrant to break open a door or window and enter a private house if he has given "notice of his authority and purpose" and has been "refused admittance." 18 U.S.C. § 3109. This statute codifies a common law principle, "embedded in Anglo-American law," requiring a law enforcement officer to knock and announce himself before entering a home. *Miller v. United States*, 357 U.S. 301, 313 (1958). In 1995, the Supreme Court "squarely held" that the knock and announce principle "is an element of the reasonableness inquiry under the Fourth Amendment" and thus applies to actions by state law enforcement officers as well. *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).

[12] As a general rule, the knock and announcement must take place before a law enforcement officer may "break open the doors of a dwelling." *Wilson*, 514 U.S. at 929. Even a minor entry or an entry which does not cause property damage is a "breaking." *See, e.g., United States v. Ramirez*, 523 U.S. 65, 71-72 (1998) (officers broke one garage window and pointed gun through broken window); *Sabbath v. United States*, 391 U.S. 585, 589-90 (1968) (holding that opening of closed but unlocked door by police officers constituted "breaking" under § 3109); *Miller*, 357 U.S. at 305-06 (holding that, when officers ripped the chain off door to gain entry before announcing purpose to arrest, requirements of § 3109 were not fulfilled). In this case, the officers entered through a patio door which was wide open, but which was blocked by some blinds; Deputy Shelnutt held the blinds aside while he and Deputy Jacobs entered.

In addition, once the officer has knocked and announced, he must wait a reasonable amount of time before entering. "[T]he facts known to the police are what count in judging reasonable waiting time . . . ." *United States v. Banks*, 540 U.S. 31, 39 (2003).

927, 929 (1995). The principle typically is understood to require both a knock and an announcement prior to entering. *See, e.g., United States v. Buckley*, 4 F.3d 552, 558 (7th Cir. 1993), *cert. denied sub nom. Herman v. United States*, 510 U.S. 1124 (1994). The announcement generally must relate both the officer's identity as a member of law enforcement and his purpose or authority. *See Wilson*, 514 U.S. at 929.[13] Because the knock and announce principle is a part of the reasonableness inquiry according to which any search is judged, it is relevant to searches conducted without a warrant under some recognized exigency, as well as those authorized in advance by a warrant.[14]

The knock and announce principle is but one part of the reasonableness inquiry to be conducted under the Fourth Amendment. *See Wilson*, 514 U.S. at 929. Therefore, the elements described above are not applied strictly in

---

[13] *See also* 3 Wayne R. LaFave, Search and Seizure: A Treatise On the Fourth Amendment § 4.8(c) (3d ed. 1996) ("It would seem that [the requirement described in *Wilson v. Arkansas*] is not intended to be different from the common 'authority and purpose' assertion, as the authority cannot be established without a reference to purpose, in this context, execution of a search warrant.").

[14] Although most of the cases developing the contours of the knock and announce principle have been decided in the context of police officers executing search or arrest warrants, the guidelines developed in those cases also apply to situations in which police officers conduct warrantless searches. The requirements of § 3109 have been held to cover warrantless searches and warrantless entries to arrest made by federal agents. *See, e.g., Sabbath*, 391 U.S. at 588; *Miller*, 357 U.S. at 308-09 ("The requirement . . . applies . . . whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant."). *See also* 1 William E. Ringel, Searches & Seizures, Arrests and Confessions § 6:7 (2d ed. 2004).

every situation. *See, e.g., id.* at 934 (holding that "[t]he Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests").[15] We are mindful that the principle of "knock-and-announce," as an "element of the reasonableness inquiry," has never been a "rigid" rule. *Id.* Although "in some circumstances an

---

[15] For instance, this court has held that, in certain circumstances, the announcement of purpose is not necessary:

> [W]hen it is clear that someone is at home, officers must explain not just who they are but also why they are there. . . . But where . . . officers have knocked and announced "Police," with no answer whatsoever, *and* there are no signs that anyone is at home, . . . [the] common law rules . . . may be complied with, in spirit at least, even if the officers neglect to state what their business is.

*United States v. Leichtnam*, 948 F.2d 370, 374 (7th Cir. 1991) (emphasis in original). At least one of our sister circuits has held that, in certain circumstances, the knock is not required. *See, e.g., United States v. Mendoza*, 281 F.3d 712, 717 (8th Cir.) (holding that police had acted consistently with purposes underlying the knock and announce principle, even when no knock was given, when officers shouted warning and door already was off its hinges), *cert. denied*, 537 U.S. 1004 (2002).

When made, "[a] knock and announcement must be loud enough to be heard." *Leichtnam*, 948 F.2d at 374 (approving an announcement made "slightly above conversational level") (internal quotations omitted); *cf. United States v. Spriggs*, 996 F.2d 320, 322-23 (D.C. Cir.) (holding that announcement was "sufficient to alert the residents of the apartment" where "reasonably audible" and "slightly above a normal tone of voice" and made at 7:45 a.m., when residents likely to "be awake and responsive") (internal quotations omitted), *cert. denied*, 510 U.S. 938 (1993).

officer's unannounced entry into a home might be a violation of the Fourth Amendment," in other circumstances, an unannounced entry may be justified by "countervailing law enforcement interests." *Id.*

Courts have recognized three sets of circumstances which constitute exceptions to the knock and announce principle. "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion[16] that knocking and announcing their presence, under the particular circumstances, would be [(1)] dangerous or [(2)] futile,[17] or [(3)] that it would inhibit effective investigation of the crime by . . . allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). This court has described these situations, in which "executing [a] search in a no-knock fashion" is justified, as "exigent circumstances." *United States v. Singer*, 943 F.2d 758, 762 (7th Cir. 1991); *see also Sledd*, 102 F.3d at 288.

---

[16] The showing required by the reasonable suspicion standard is "not high," and certainly requires less than probable cause. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

[17] Deputy Shelnutt argues that an announcement of purpose should be excused as futile on the ground that Mr. Leaf was asleep. However, the futility exception to the knock and announce principle applies when the occupant of the premises to be entered most likely already knows why the officers are approaching. *See, e.g., Miller*, 357 U.S. at 310 ("It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain that the [occupant] already knows their purpose so that announcement would be a useless gesture."); *United States v. Tracy*, 835 F.2d 1267, 1270 (8th Cir.) ("[T]he officers could have justifiably believed defendants were anticipating their arrival and knew their purpose. Thus, announcing their purpose would have been a useless gesture."), *cert. denied*, 486 U.S. 1014 (1988). On the record in this case, we must conclude that the futility exception does not apply.

Most of the cases explaining the danger exception to the knock and announce principle have taken place in the context of searches pursuant to warrant.[18] However, this court also has excused officers' failure to comply with the knock

---

[18] *See, e.g., Ramirez*, 523 U.S. at 71 (holding that police had a reasonable suspicion that "knocking and announcing their presence might be dangerous," justifying their unannounced entry to execute an arrest warrant, when a "confidential informant had notified the police" that a man "with a violent past who reportedly had access to a large supply of weapons" "might be inside respondent's home, and an officer had confirmed that possibility"). This court has excused compliance with the knock and announce principle in circumstances presenting danger to officers executing warrants. *See, e.g., United States v. Sutton*, 336 F.3d 550, 554 (7th Cir. 2003) (excusing "less than full compliance" with knock and announce principle by officers executing search warrant when pit bulls had been seen on the property, individuals with weapons convictions had been seen entering the house and configuration of house "provided no cover"); *United States v. Gambrell*, 178 F.3d 927, 929 (7th Cir.) (holding that, when officer knew before entering that the occupant typically "answered the door wearing a .25 caliber gun in her front pocket; that she and her roommate regularly carried guns in the apartment; [and] that . . . there were other guns . . . in the apartment," there was "a reasonable suspicion that an announced entry would have subjected the officers to a substantial risk of harm"), *cert. denied*, 528 U.S. 920 (1999); *United States v. Buckley*, 4 F.3d 552, 558 (7th Cir. 1993) (determining that "exigent circumstances" excused knock and announce where "the officers knew that the defendants possessed a pit bull and firearms"), *cert. denied sub nom. Herman v. United States*, 510 U.S. 1124 (1994); *United States v. Howard*, 961 F.2d 1265, 1267 (7th Cir.) (concluding that "exigent circumstances justified disregarding the knock and announce requirement" where officers executing search warrant "had specific knowledge that the [occupant] was in possession of a firearm, and that he had previously fired it in the hallway outside his apartment"), *cert. denied*, 506 U.S. 882 (1992).

and announce principle when the officers were making a warrantless entry and the circumstances gave rise to a reasonable belief that knocking and announcing would be dangerous to the officers. *United States v. Hardy*, 52 F.3d 147, 150 (7th Cir.), *cert. denied*, 516 U.S. 877 (1995). In *Hardy*, "the same exigent circumstances" that justified an officer's warrantless search of a hotel room "also excuse[d] a failure to knock and announce." *Id.* The circumstances known to the police in that case led them to "reasonably believe that their safety or the safety of others" was at risk. *Id.* at 149.[19]

In this case, the circumstances reflected in the record compel the conclusion that the officers had a reasonable basis to conclude that knocking and announcing themselves would have been dangerous. Although Deputy Jacobs had not seen or heard a person within the apartment during his approximately eight-minute observation, there were several signs that someone other than the apartment's lawful occupant had entered it. For instance, the sliding patio door had been left open and an ice chest had been pushed up against the apartment's front door; this would have been consistent with the presence of a burglar attempting to block all but one path of entry and exit.

The officers had no conclusive information that the apartment was empty. The residents told Deputy Jacobs they had seen a man forcing entry into the apartment, and Deputy Jacobs did not witness anyone leave the apartment during his eight-minute observation prior to Deputy Shelnutt's

---

[19] In *Hardy*, the room's occupant was a murder suspect who knew that the police were pursuing him, had a history of committing crimes using guns and was known to be armed with a shotgun; also, women and children were known to be in the room with him. *See United States v. Hardy*, 52 F.3d 147, 149 (7th Cir.), *cert. denied*, 516 U.S. 877 (1995).

arrival. Deputy Jacobs had shone a flashlight upon the broken window and open patio door; that alone could have alerted a burglar to the need to remain still and silent. Although the interior of the apartment did not appear to have been disturbed, this may have convinced the officers that an intruder still was present. Furthermore, the officers had very little information about the identity or temperament of the person who may have been inside except that Murphy had told Deputy Jacobs the man was belligerent. Indeed, all signs pointed to the need to investigate and to exercise caution in doing so.

Taking all the facts and circumstances in the light most favorable to the Leafs, we still must conclude that Deputy Shelnutt did not violate the Fourth Amendment by entering Mr. Leaf's apartment without knocking and without announcing his purpose.[20]

---

[20] We note that our holding is based on the specific facts presented by this case and not on a general invocation of exigent circumstances. The Supreme Court has instructed that, when "exigent circumstances" might have justified officers' warrantless entry into a home without a knock, if the record does not reflect "any substantial basis for excusing the failure of the agents . . . to announce their authority and purpose," the entry violates the Fourth Amendment. *Sabbath*, 391 U.S. at 591. When agents making a warrantless entry "ha[ve] no basis for assuming [the occupant is] armed or might resist arrest, or that [the undercover agent present is] in any danger," then compliance with the knock and announce principle will not be excused. *Id.* This guidance accords with the Court's later directive, made in *Richards*, that officers must have a "reasonable suspicion," based on the circumstances, that one or more of the exceptions to the knock and announce principle applies. *Richards*, 520 U.S. at 394. There is no general rule permitting officers to enter a private residence

(continued...)

## D. The Protective Sweep

We next address the search that Deputy Shelnutt conducted inside Mr. Leaf's apartment. The district court determined that there was a question as to whether that search was carried out unreasonably. Specifically, the court found that, because Deputies Shelnutt and Jacobs used tactical lights, because they did not identify themselves as law enforcement officers or illuminate their badges, and because they did not wake Mr. Leaf immediately after finding him, a jury could determine that Deputy Shelnutt had acted in an objectively unreasonable manner in searching the apartment. The district court also found that there was a question as to whether Deputy Shelnutt's conduct during the search of the apartment unreasonably created the need for force. On the record in this case, we respectfully disagree with the district court's analysis. In our view, Deputy Shelnutt is entitled to qualified immunity because his search of the apartment did not violate the Fourth Amendment.

Deputy Shelnutt does not dispute any of the factual findings made by the district court with respect to his search of

---

[20] (...continued)
without complying with the knock and announce principle whenever exigent circumstances are present; in fact, the Supreme Court in *Richards* forbade a blanket rule which would excuse compliance for an entire class of cases. *Id.* To hold that the knock and announce principle may be disregarded *any time* exigent circumstances justify a warrantless search would be to eviscerate *Richards*. Rather, in this case, the "countervailing law enforcement interests," *Wilson*, 514 U.S. at 934, convince us that it was reasonable for the officers to protect their safety by complying less than fully with the knock and announce principle in a situation of questionable security.

the apartment: for instance, that neither he nor Deputy Jacobs identified themselves after entering the apartment; that both officers lit the apartment with the tactical lights attached to their guns; that neither officer illuminated his badge; and that the officers did not attempt to wake Mr. Leaf immediately after finding him, but instead searched the rest of the apartment before waking him. However, Deputy Shelnutt does contend that he is entitled to qualified immunity for the search on the ground that it was justified under the protective sweep doctrine described in *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A "protective sweep" has been defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others . . . [and] narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* Although a protective sweep invades a homeowner's privacy, such a search tactic may be "reasonable when weighed against 'the need for law enforcement officers to protect themselves and other prospective victims of violence.' " *Id.* at 332 (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).

A protective sweep, limited to "look[ing] in closets and other spaces immediately adjoining the place of arrest," is justified "incident to [an] arrest . . . as a precautionary matter and without probable cause or reasonable suspicion." *Id.* at 334. A search beyond those parameters is justified when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* "[A] protective sweep . . . is . . . not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable

suspicion of danger . . . ." *Id.* at 335-36. We have recognized generally that while entry into a dwelling typically requires a search warrant founded on probable cause, a "quick inspection[ ] may be justified by lower degrees of suspicion." *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995); *see also United States v. Concepcion*, 942 F.2d 1170, 1173 (7th Cir. 1991) ("How much cause agents need to do something depends on how deeply they invade the zone of privacy.").

We have noted on previous occasions that the inquiry whether a protective sweep was reasonable is "necessarily a very fact-specific one." *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir.), *cert. denied*, 515 U.S. 1168 (1995). Furthermore, "the circumstances of the particular encounter [must] be assessed carefully in light of the overarching policy concerns articulated in *Buie* and in its first cousins, *Terry* and *Long*." *Id.*; *see also Terry*, 392 U.S. 1; *Michigan v. Long*, 463 U.S. 1032 (1983). Those policy concerns include a proper regard for the safety of police officers, who "have an interest in ensuring their safety when they lawfully enter a house . . . . That interest justifies their ensuring that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *Burrows*, 48 F.3d at 1015-16.[21]

---

[21] Beyond the protective sweep doctrine, another line of cases recognizes that law enforcement officers may conduct a quick and limited search of a dwelling which they have entered based on "legitimate concerns" about the safety of the occupants. *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("[W]ith some (though far from strong) reason to fear for Bonds's safety, the agents could take some steps to protect her."); *see also United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993) (finding a limited search of dwelling place was lawful under the exigent circum-

(continued...)

The Leafs contend that the search conducted by Deputy Shelnutt upon entering the apartment was not justified, because the cases have approved protective sweeps *incident to arrest*. The Leafs submit that the officers, when they entered the apartment, did not intend to make an arrest.[22] However, the Leafs' argument misapprehends the lineage of the protective sweep. Although *Buie* recognizes that a protective sweep "occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime," the protective sweep doctrine also is justified by the concerns that an officer conducting an in-home arrest is at a "disadvantage" and that he is susceptible to "[a]n ambush in a confined setting of unknown configuration." *Buie*, 494 U.S. at 333. This concern for officer safety derives from the same principles recognized in *Terry*. *See United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993), *cert. denied*, 510 U.S. 1139 (1994). The protective sweep is justified by the need, based on the facts known to a law enforcement officer, to ensure officer and bystander safety. *Buie*, 494 U.S. at 327. The underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a private dwelling. *Arch*, 7 F.3d at 1303. That rationale also applies in this situation. The officers entered in order to ascertain whether a burglary had occurred; they had

---

[21] (...continued)
stances exception to the warrant requirement when police feared injured individuals were inside), *cert. denied*, 510 U.S. 1139 (1994).

[22] This court has recognized that the logic of "*Buie* assumes that the police already are lawfully present in the home to arrest its occupant and that a sweep is necessary to avert any immediate danger posed by others on the premises." *Arch*, 7 F.3d at 1303 (citing *Buie*, 494 U.S. at 327, 333, 336).

substantial reason to believe their safety might have been at risk. Accordingly, it was not necessary for the officers to have made an arrest in order for their search of the apartment to be justified; the only question is whether the search was objectively reasonable.

We have reviewed the record in this case and must conclude that the decision to conduct a protective search was reasonable, and that the sweep was conducted in a reasonable manner. The officers, already lawfully present in the apartment, had reason to believe that they might be faced with an ongoing crime or an individual in danger. Therefore, they were justified in conducting a brief, three-minute sweep, extending no more broadly than necessary to ascertain whether those suspicions were correct. In light of the policies expressed in *Buie*, the officers were entitled to ensure their own safety after entering a dwelling which they suspected was the target of a crime, and from which no person had been seen emerging. The intrusiveness of the search was minimal, and its scope was limited appropriately by its purposes.

Furthermore, the officers did not act unreasonably in speaking in low tones and using the tactical lights on their weapons. They had entered Mr. Leaf's apartment on the suspicion that someone other than the lawful occupant might be present inside. Given the facts known to the deputies at the time of their entry—the open screen door, the broken window, the front door that had been kicked in, the dark apartment, the unanswered 911 call and the fact that someone was seen forcing entry into the apartment—a reasonable officer could have believed that the apartment potentially harbored a dangerous intruder. Even after they had witnessed Mr. Leaf lying on the bed, the officers could not have been sure that they would not be surprised by another person until they had conducted a protective sweep.

We also must conclude that, based on the circumstances facing them, the officers behaved reasonably by not waking Mr. Leaf immediately. Furthermore, until they had determined that no dangerous person was hiding in the apartment, the officers behaved reasonably in using the tactical lights on their guns and remaining quiet.

In light of these considerations, we must conclude that the Fourth Amendment was not violated by the very limited protective sweep that Deputy Shelnutt conducted. Approving this search does not pervert the Fourth Amendment "to achieve ends other than those acknowledged as legitimate." *Burrows*, 48 F.3d at 1017.[23] Based on our analysis of Deputy Shelnutt's entry into the apartment and his brief search of the apartment, we must conclude that Deputy Shelnutt is entitled to qualified immunity for the Leafs' illegal search claim. The conclusion that Deputy Shelnutt did not conduct an unreasonable search of the apartment compels the further conclusion that his entry and search did not unreasonably create the need for his later use of force. *See, e.g., Sledd*, 102 F.3d at 287-88. The question of whether other actions taken by the deputies constituted excessive use of force, however, is not before us on this appeal.

---

[23] We note that, even if we had found that the Fourth Amendment forbade the search at issue here, Deputy Shelnutt still would be entitled to qualified immunity, because it is not clearly established that such a sweep violates the Constitution. Decisions from both the Supreme Court of the United States and this court have sketched the outlines of the protective sweep in terms of the reasonable suspicion standard, emphasizing a concern for the safety of law enforcement officers. Therefore, under these circumstances, the unlawfulness of the protective sweep would not have been apparent to a reasonable officer.

### E. Illegal Seizure

We turn next to Deputy Shelnutt's assertion that he is entitled to qualified immunity for the Leafs' illegal seizure claim. In its order of October 14, 2003, the district court denied the Leafs' motion for partial summary judgment on their illegal seizure claim. The district court determined that the officers had seized Mr. Leaf in his bed, but found a genuine issue of triable fact existed as to whether the seizure was unreasonable in violation of the Fourth Amendment. Although Deputy Shelnutt asserted qualified immunity in his response to the Leafs' summary judgment motion, the district court did not address qualified immunity for the illegal seizure claim. The district court only addressed qualified immunity later, in its January 6, 2004 order.[24] There, the court noted generally that "fact issues . . . on the claims for unlawful entry, search and seizure, and excessive force . . . prevent the Court from deciding as a matter of law whether Shelnutt is entitled to qualified immunity on those claims." R.219 at 25.

---

[24] We cannot accept the Leafs' contention that Deputy Shelnutt's appeal of this issue on qualified immunity grounds is not timely. It is true that, when the Leafs earlier moved for partial summary judgment on their illegal seizure claim, Deputy Shelnutt replied to that motion by arguing that his actions were constitutional and that, in the alternative, he was entitled to qualified immunity. In ruling on the motion, the district court denied the Leafs' motion for summary judgment on the ground that there were genuine issues of triable fact. Deputy Shelnutt therefore prevailed on this motion on a ground other than qualified immunity. The district court never reached the alternate issue of qualified immunity. Notably, when the district court reached the qualified immunity issue in its later order, it gave no indication that it had addressed the issue earlier.

### 1.  Whether a Seizure Occurred

We begin our review of the district court's decision to deny Deputy Shelnutt qualified immunity for the seizure by asking whether the facts alleged, taken in the light most favorable to the Leafs, show that Deputy Shelnutt violated the Constitution. *See Saucier*, 533 U.S. at 201. The Fourth Amendment prohibits unreasonable seizures. *See, e.g., California v. Hodari D.*, 499 U.S. 621, 624 (1991). In order to determine whether Deputy Shelnutt seized Mr. Leaf in violation of the Fourth Amendment, we must engage in a two-part inquiry. *See White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002). We first consider whether Mr. Leaf was seized in his bedroom on May 5, 2001; if we conclude that he was seized, we then must determine whether the seizure was unreasonable. *See id.*

A seizure has been defined as a "governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original). A person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person [in the subject's position] would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As well, for a seizure to have taken place, "the subject [must] actually yield to a show of authority from the police or be physically touched by the police." *Tom v. Voida*, 963 F.2d 952, 957 (7th Cir. 1992) (citing *Hodari D.*, 499 U.S. at 626).

In concluding that Mr. Leaf was seized, the district court determined that a reasonable person in Mr. Leaf's situation would have believed that he was not free to leave. The Supreme Court has noted that a reasonable person might not believe he was free to leave when faced with "the threatening presence of several officers, the display of a weapon

by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. Furthermore, this court has noted some other factors that might influence a reasonable individual to believe that he was not free to leave: "whether the encounter occurred in a public or private place; whether the suspect was informed that he was . . . free to leave; . . . whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance." *United States v. Scheets*, 188 F.3d 829, 836-37 (7th Cir. 1999), *cert. denied*, 528 U.S. 1096 (2000).

In light of the fact that two police officers had their guns and tactical lights pointed at Mr. Leaf, while he lay in his bed in his own residence in the middle of the night, we agree with the district court that a reasonable person would not have believed that he was free to leave. However, this issue is not dispositive of the ultimate question of whether a seizure occurred. "[T]he objective test of *Mendenhall* states a necessary, but not a sufficient, condition for seizure." *Tom*, 963 F.2d at 957. We must also consider whether Mr. Leaf was physically touched by the officers or whether he submitted to their authority, before we may conclude that a seizure occurred. *Id.*

The district court thought that the question of seizure turned on whether or not Mr. Leaf submitted to the officers' show of authority. However, because a seizure must be accomplished "*through means intentionally applied,*" it is not the case that a seizure occurs every time there is a "governmentally *desired* termination of an individual's freedom of movement." *Brower*, 489 U.S. at 597 (emphases in original). Where police seek to stop someone, but the subject is "in fact stopped . . . by a different means," no seizure occurs. *Id.* If Mr. Leaf's failure to flee can be attributed to the fact that

he was asleep or otherwise unconscious, we think that it cannot be said that the officers terminated his freedom of movement through their show of authority. Thus, the fact that Mr. Leaf did not flee, taken alone, cannot establish that he was seized.

In determining that a seizure had occurred, the district court did not make a finding as to whether or not Deputy Shelnutt actually touched Mr. Leaf. In fact, in its January 6, 2004 order denying Deputy Shelnutt qualified immunity, the district court stated that whether Deputy Shelnutt had touched Mr. Leaf was "irrelevant to the present motion." R.219 at 4. We may not reconsider the district court's apparent conclusion that there was a question of fact as to whether any touching occurred, nor may we express an opinion about which facts the parties may ultimately be able to establish at trial. *Johnson*, 515 U.S. at 313.

The Supreme Court has noted that "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Hodari D.*, 499 U.S. at 626; *see id.* ("An arrest requires . . . physical force . . . ."). However, the Court has also said that, when a person merely is tapped on the shoulder by law enforcement agents attempting to get that person's attention, no seizure occurs. *See INS v. Delgado*, 466 U.S. 210, 220-21 (1984).[25] This observation conforms to the Court's directive that a seizure is a "governmental *termination of freedom of movement*." *Brower*, 489 U.S.

---

[25] *See also Martinez v. Nygaard*, 831 F.2d 822, 826-27 (9th Cir. 1987) (holding that man was not seized when officers grabbed him "to get his attention" and then released him); *cf. United States v. Sokolow*, 808 F.2d 1366, 1369 (9th Cir. 1987) (holding that man was seized when officers grabbed him and moved him to a seat for questioning before releasing him), *rev'd on other grounds*, 490 U.S. 1 (1989) (assuming, without deciding, that a seizure occurred).

at 597 (emphasis added). Here, Deputy Shelnutt sought to get Mr. Leaf's attention, not to terminate his freedom of movement. Thus, the Leafs have not alleged the first part of a Fourth Amendment violation; on these facts, they cannot show that Mr. Leaf was seized. Therefore, we must conclude that there was no unreasonable seizure in violation of the Fourth Amendment, and that Deputy Shelnutt is entitled to qualified immunity as a defense against the Leafs' illegal seizure claim.

### 2.   Whether a Seizure was Unreasonable

In the alternative, we note that, even if Deputy Shelnutt's conduct towards Mr. Leaf could be considered a seizure, it was reasonable as a matter of law. The reasonableness of a seizure is measured by weighing the governmental need to seize "against the invasion into one's privacy that the . . . seizure entails." *United States v. Sechrist*, 640 F.2d 81, 86 (7th Cir. 1981). When a police officer suspects that criminal activity is afoot, "[a] brief stop of a suspicious individual, in order to determine his identity . . . may be most reasonable in light of the facts known to [an] officer at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972) (citing *Terry*, 392 U.S. at 21-22). This court has held that "[a]n investigatory stop not amounting to an arrest is authorized if the officer making the stop is 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. at 21-22).

We judge the reasonableness of an investigatory stop by considering: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." *Id.*; *see also Scheets*, 188 F.3d at 837.

When evaluating the reasonableness of an investigatory stop, we consider the totality of the circumstances with which the officers were faced, in terms of both "the experience of the law enforcement agent and the behavior and characteristics of the suspect," and "exclud[ing] any facts learned thereafter." *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995).

Even taking the facts in the light most favorable to the Leafs, as we must when considering qualified immunity, *Saucier*, 533 U.S. at 201, we think that Deputy Shelnutt's conduct was reasonable. First, Deputy Shelnutt was aware of sufficient specific and articulable facts to give rise to reasonable suspicion that crime was afoot. As we have noted numerous times, the officers suspected someone had broken into the apartment. Furthermore, as the district court pointed out, "the officers did not know the identity of the [apparently] sleeping man." R.172 at 9. It is not important that the behavior that the officers observed (Mr. Leaf lying on his bed, apparently sleeping) could have been innocent behavior. Innocent characteristics, when "taken together," may add up to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Indeed, "there could . . . be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam) (citing *Terry*, 392 U.S. at 27-28).

The degree of intrusion also was reasonably related to the facts known to the officers while they were in the apartment. The record reflects a minimally intrusive stop. Faced with signs of a break-in and already lawfully within the apartment, Deputy Shelnutt wanted to awaken the man lying on the bed to determine who he was and why he was present. Thus, he moved to nudge the man awake. This behavior hardly can be called intrusive.

The Leafs argue that Deputy Shelnutt should have attempted to wake Mr. Leaf by a means other than approaching him to nudge him. However, the Supreme Court has held that the reasonableness of an officer's actions "does not turn on the availability of less intrusive investigatory techniques." *Sokolow*, 490 U.S. at 11. Therefore, the manner in which Deputy Shelnutt approached Mr. Leaf does not render unreasonable any seizure that occurred.

It also is clear that any seizure that might have occurred did not last any longer than reasonably necessary. At most, Deputy Shelnutt engaged in a brief touch. *See, e.g., Hodari D.*, 499 U.S. at 625 (no continuing seizure after fugitive breaks free of officer's grasp). The Supreme Court has stated that a court reviewing the duration of an investigative stop should ask "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The means of investigation employed by the officers in this case, rousing a man to determine his identity, certainly constituted a quick way to gather information—perhaps the means used were the only way for the officers to learn what they needed to know. Furthermore, when "police are acting in a swiftly developing situation," as was the case here, a court must not "indulge in unrealistic second-guessing." *Id.*

Viewing the facts of this case in the light most favorable to the Leafs, we must conclude that there has been no showing that Deputy Shelnutt violated Mr. Leaf's constitutional rights by his conduct towards Mr. Leaf as Mr. Leaf lay in his bed. There was no seizure, and furthermore, Deputy Shelnutt's behavior was reasonable. Therefore, he is entitled to qualified immunity as a defense to the Leafs' claim for illegal seizure.

## F. Excessive Force

The district court denied Deputy Shelnutt qualified immunity for the Leafs' excessive force claim on two grounds. First, the court found that a jury would have to determine whether Deputy Shelnutt's use of force itself was justified as a matter of law, based on the threat presented by Mr. Leaf. Deputy Shelnutt does not ask that we address the district court's decision on this issue. Thus, Deputy Shelnutt's immediate use of force in the encounter with Mr. Leaf— whether Mr. Leaf threatened "death or serious physical harm" and "whether it was unreasonable for Shelnutt to take the second shot at Leaf"—remains for adjudication. R.219 at 26.

Second, the district court noted that there was a question for the jury as to whether the unreasonableness of Deputy Shelnutt's actions leading up to the encounter in the bedroom "unreasonably created the need for force." R.219 at 26-27. Based on our analysis of the preceding issues, we must conclude that the district court's second ground was an incorrect basis for denying qualified immunity. Because we have determined that Deputy Shelnutt is entitled to qualified immunity against the claims that he acted unreasonably in searching the apartment and in seizing Mr. Leaf, we also must conclude that he is entitled to qualified immunity against any claim that he unreasonably created the need for force.

## G. Failure to Intervene

The district court also denied Deputy Shelnutt summary judgment on the Leafs' claim that he failed to intervene in Deputy Jacobs' unlawful conduct. Because we have determined that the officers' actions inside the apartment constituted neither an illegal search nor an illegal seizure, we

must conclude that the Leafs do not have a cognizable claim against Deputy Shelnutt for failing to intervene in Deputy Jacobs' actions.

The only remaining conduct of which the Leafs complain is the use of force against Mr. Leaf when Deputy Shelnutt shot him, causing his death. As we noted above, a claim for excessive force based on the shots fired at Mr. Leaf remains before the district court. However, Deputy Shelnutt engaged in the act of shooting, not Deputy Jacobs. Therefore, as Deputy Shelnutt correctly argues, there is no basis for the failure to intervene claim.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion. Deputy Shelnutt may recover his costs in this court.

REVERSED and REMANDED

A true Copy:
    Teste:

 

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*