198 F.3d 225 (6th Cir. 1999)
 Nancy L. Ellis, individually and as next friend of Catherine E. Lanthorn; Catherine E. Lanthorn, minor child of deceased, Craig W. Lanthorn, Plaintiffs-Appellants/Cross-Appellees,
v.
Washington County and Johnson City, Tennessee; Ron Street, Chief of Police, in his Official Capacity; Sam Garland, in his Individual and Official Capacity, as a jailor employed by Johnson City; R. D. Jamerson and Billy Mitchell, Officers of the Jail, Washington County Sheriff's Department, in their Individual and Official Capacities; Fred Phillips, Successor to Ron England as Sheriff of Washington County, Tennessee, in his Official Capacity, Defendants-Appellees,
R.D. Jamerson, Cross-Appellant.
 Nos. 98-6178, 98-6228
 UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT
 Argued: August 12, 1999
Decided and Filed: November 30, 1999
 
 Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville, No. 95-00325--Curtis L. Collier, District Judge.
 Wanda G. Sobieski, Diane Marie Messer, SOBIESKI, MESSER & ASSOCIATES, Knoxville, Tennessee, for Appellants.
 Thomas J. Garland, Jr., MILLIGAN & COLEMAN, Greeneville, Tennessee, Jennifer P. Keller, Ronald S. Range, Jr., BAKER, DONELSON, BEARMAN & CALDWELL, Johnson City, Tennessee, Olen G. Haynes, ARNOLD, HAYNES & SANDERS, Johnson City, Tennessee, Richard A. Spivey, Kingsport, Tennessee, Kent E. Herrin, HERRIN, BOOZE & RAMBO, Johnson City, Tennessee, for Appellees.
 Before: MERRITT, KENNEDY, and DAUGHTREY, Circuit Judges.
 MERRITT, J., delivered the opinion of the court, in which KENNEDY, J., joined. DAUGHTREY, J. (pp. 11-16), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 MERRITT, Circuit Judge.
 
 
 1
 In this wrongful death action, plaintiffs, Nancy Ellis, individually, as the mother of Craig Lanthorn, now deceased and as next friend of Catherine E. Lanthorn, and Catherine Lanthorn, individually, minor child of deceased, Craig Lanthorn, sued the defendants, Johnson City and Washington County, Tennessee, a city and the county in which it is located. Plaintiffs also sued three jailors: Sam Garland, employed by the Johnson City Jail; and R. D. Jamerson and Billy Mitchell, employed by Washington County Jail. Plaintiffs brought suit under 42 U.S.C. § 1983 for the suicide of Craig Lanthorn while incarcerated at the Washington County Jail on August 3, 1994, three hours after being transferred there from the Johnson City Jail. The primary issue we deal with in this opinion is whether the actions or policies of the defendants, or any of them, was the proximate cause of the suicide. We conclude as to all defendants, except Jamerson, that the plaintiffs have failed to establish proximate causation and therefore affirm the summary judgment entered below as to Washington County and Johnson City. We affirm the District Court's grant of summary judgment on grounds of qualified immunity to jailors Garland and Mitchell. We conclude that we lack interlocutory appellate jurisdiction as to the defendant Jamerson's claim that the District Court erred in refusing to grant him qualified immunity.
 
 
 2
 I. Washington County's Liability for Failure to Train Its Jailors to Prevent Suicide
 
 
 3
 The case proceeded in the court below on the theory that Craig Lanthorn committed suicide in "cell block B-4" of the Washington County Jail by hanging himself at approximately 1:55 P.M. on August 3, 1994. This cell had a monitor camera at one end. It was not designed as a suicide prevention cell. Plaintiffs claim that Lanthorn should have been placed in a suicide prevention cell and that all sheets and clothing useful in committing suicide should have been removed. They also claim that the County did not give the jailors adequate training in suicide prevention.
 
 
 4
 On the afternoon of August 2, 1994, Craig Lanthorn was arrested at the residence of Dr. and Mrs. James Turnbull, following a 911 call from the Turnbull's daughter, Sara, reporting that Lanthorn, her boyfriend, was attempting to break into the house. She left the residence and hid in a neighbor's yard after Lanthorn broke a window to gain access through the back door. Dr. Turnbull, a psychiatrist,testified that Lanthorn was "delirious or delusional," and he attributed this to "Lanthorn's drug use," not to suicidal tendencies or a mental illness. Arresting officer Hensley believed that Lanthorn was drunk. He was "dazed or disoriented," "unsteady on his feet" but "cooperative." Hensley carried Lanthorn to the Johnson City Jail and charged him with public intoxication and criminal trespass. He was held overnight in the Johnson City Jail. After he was arraigned in court the next morning, where he was represented by counsel, the Johnson City police carried him to the Washington County Jail to await trial.
 
 
 5
 During the period from 11:00 A.M. in the morning when Lanthorn arrived at the Washington County Jail until his suicide three hours later, nothing occurred that would put reasonable jailors on notice of a possible suicide attempt. Jailor Robertson talked to Lanthorn about suicide when Lanthorn arrived, and Lanthorn said that he was not a suicide risk and "loved life." A few minutes later Jailor Mitchell, who had gone to high school with Lanthorn, came on duty. He was concerned about Lanthorn's mental health and so advised his superior, who told him to determine if Lanthorn was a suicide possibility. Mitchell found Lanthorn on the second floor of the jail talking to his mother. He seemed to be crying. After the phone call, Mitchell engaged him in conversation. Mitchell asked Lanthorn, "Craig, are you suicidal?" Lanthorn said, "Hell no, I've got a baby on the way that I've got to take care of."
 
 
 6
 Finally, and most important of all, plaintiff in this case, Nancy Ellis, Lanthorn's mother, is an experienced, practicing, licensed, clinical psychologist with a Ph.D. She stated two months after the death of her son in a letter that "he was not suicidal at 11:30 when I talked to him [on the phone]," and he "knew he was getting out [of jail]":
 
 
 7
 Craig had everything to live for, a family who adored him, a child on the way, numerous friends and, a positive future. He was immensely likable. Although he had had some painful experiences, he was dealing with this in therapy and was very enthusiastic about treatment. One of the things we talked about in our last conversation was his next session with Ted (his psychologist). He was eager to get there. (App. 474.)
 
 
 8
 Based on these facts -- particularly in view of his mother's expert opinion two months later and jailor Mitchell's conversation about suicide -- there is no evidence from which a reasonable jailor would have foreseen suicide. No deliberately indifferent policy was a proximate cause of the death. When an experienced expert in the field of psychology, like decedent's mother, plaintiff, Nancy Ellis, was unable to predict suicide, and did not think it was necessary to warn her son's jailors of such a possibility, it is unreasonable to attribute fault to the County or its jailors for failing to predict suicide. The County was under no legal obligation to isolate Lanthorn in a suicide cell or take other extraordinary steps in anticipation of suicide. Whatever the county may have failed to do in training its jailors about suicide, its training program was not a proximate cause of the injury here. Its conduct was no more a proximate cause of the suicide than was the failure of plaintiff Ellis herself -- an expert in the field -- to foresee the result.
 
 
 9
 The same reasoning applies to jailor Mitchell, the jailor who was in high school with Lanthorn. Mitchell recognized that Lanthorn was mentally unstable and interrogated him about suicide. After the interview, Mitchell made a mistake in assessing Lanthorn's suicidal tendencies -- just as did Lanthorn's mother -- but he certainly was not deliberately indifferent toward Lanthorn and exhibited a genuine concern for his welfare while in jail. The District Court did not err in granting summary judgment for Mitchell.
 
 
 10
 II. Liability of Johnson City and its Jailors for Lanthorn's Suicide
 
 
 11
 Although Lanthorn's suicide occurred in the Washington County Jail afterhis transfer, not in the Johnson City Jail, plaintiffs also seek to blame Johnson City and its jailors for the death of Lanthorn on grounds that Johnson City did not properly train its jailors in suicide prevention, which in turn led the jailors to fail to anticipate, and remain deliberately indifferent to, the possibility of Lanthorn's suicide. For reasons similar to those expressed above, we conclude that the actions and policies of Johnson City and its jailors did not proximately cause the suicide of Craig Lanthorn. There is no evidence to support a conclusion that the City or its employees should be held legally responsible for the suicide.
 
 
 12
 During the less-than-24-hour period Lanthorn was in the Johnson City Jail, he talked to his mother, plaintiff Nancy Ellis, four times by phone. He talked to his father, Dr. Lanthorn, also a clinical psychologist. His uncle, Tom Cowan, a local lawyer, came to see him in jail. Lanthorn also talked to his grandmother. Two family friends, the Farthings, also came to see him in the jail. None of these relatives or family friends posted the $100 bond necessary to release him from jail because his mother and father both wanted him to stay in jail until he agreed to enter a drug treatment program. The record is clear on this point. Neither the mother -- the plaintiff in this case -- nor the father, nor any of the relatives or family friends, warned the jailors that Craig Lanthorn might be suicidal, nor did they provide the jailors with any information that would put them on notice that this young man might try to take his own life. Moreover, both of the two psychiatrists who had treated Lanthorn, Dr. Fenley and Dr. Patel, testified that Lanthorn's behavior in jail did not indicate suicide. From their testimony it is clear that they would not have predicted or anticipated suicide.
 
 
 13
 Under these circumstances -- with experts in the field, (including his mother and father and the two psychiatrists who had treated him) failing to recognize or anticipate suicide -- counsel's argument for the plaintiffs that the City and its jailors should be held blameworthy for similar mistakes under federal constitutional law is wholly without merit. The City and its jailors may or may not have been properly trained in suicide prevention -- we reserve judgment on that question -- but that did not proximately cause the injury here. In this case the evidence in the record before us would not support a finding that the defendants should be held legally responsible in damages because they failed to anticipate and prevent Lanthorn's suicide.
 
 
 14
 The questions discussed above are relatively easy, and reflection after a review of the record can lead to only one conclusion. Defendant Jamerson's cross-appeal from the denial of his motion for summary judgment on qualified immunity presents a more difficult problem.
 
 III. Jamerson's Cross-Appeal
 
 15
 In Johnson v. Jones, 515 U.S. 304, 319-20 (1995), Justice Breyer wrote for a unanimous court, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Here, the District Court determined that there was a genuine issue of fact for trial regarding Jamerson and denied his motion for summary judgment. We have held that in order for an interlocutory appeal based on qualified immunity to lie, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." Berryman v. Rieger, 150 F.3d 561 (6th Cir. 1998).
 
 
 16
 The factual dispute here arises from plaintiffs' claim that Jamerson saw Lanthorn tie the noose around the bar at 1:45 P.M. but did not call an emergency medical team until 1:56 P.M. Plaintiffs further contend that Jamerson did not notify other jailers of the problem until 1:55 P.M. Asevidence that Jamerson saw Lanthorn tie the noose at 1:45, plaintiffs rely on the following hearsay statements Sheriff Ron England made to the press on the day of Lanthorn's death:
 
 
 17
 Our sergeant Jamerson was watching the monitors and seen [sic] him when he tried to place the loop on the bars and summonsed [sic] an upstairs jailer - they went in and one inmate helped hold him up and the jailers and the inmates took the noose from around his neck.
 
 
 18
 In a separate statement, Sheriff England said:
 
 
 19
 [Lanthorn] was a Johnson City police department prisoner and . . . they transported him down here at 11:00 a.m. . . . [H]e was booked in, placed in a cell with four other inmates, and like I said at 1:45 while watching the monitor, sergeant Jamerson seen [sic] him put the sheet around his neck which was fashioned as a rope.
 
 
 20
 On appeal, Jamerson disputes these facts which might, if true, give rise to a finding of deliberate indifference. This sort of factual dispute is precisely what the Supreme Court has instructed appellate courts to avoid on an appeal of a denial of qualified immunity, except for one thing: The statement is unreliable hearsay. It is an out-of-court declaration, offered for the truth of the matter asserted, by a declarant, who subsequently testified by deposition that he has no personal knowledge about the event and does not know now why he made the statement or what it was based on.
 
 
 21
 The question then comes down to this: In a qualified immunity appeal by a state official, should the court of appeals look behind a Johnson v. Jones type factual dispute to determine if the factual dispute is based only on uncorroborated hearsay that will not be admissible at trial. We would prefer to avoid these kinds of evidentiary issues when ruling on our jurisdiction to decide qualified immunity under Johnson v. Jones because the issue of qualified immunity cannot be "decided with reference only to undisputed facts," the requirement for appellate jurisdiction set out by the Supreme Court at 515 U.S. at 313. To decide on interlocutory appeal all of the possible fact related evidence questions present in the case would, as the Supreme Court observed, "consume inordinate amounts of appellate time" and "require a reading of a vast pretrial record" and even "greater delay" in bringing cases to a conclusion. 515 U.S. at 316.
 
 
 22
 The court below declined to grant Jamerson's motion for summary judgment because, and only because, of Sheriff England's hearsay statements. The summary judgment rule, Rule 56(e) is clear that such rulings may be based only on statements "made on personal knowledge" or statements otherwise "admissible in evidence" by a witness "competent to testify to the matters stated." Plaintiffs argue that the Sheriff's statement is an admission. But the Sheriff's admissions are not admissible in the case against Jamerson, which is against him personally.
 
 
 23
 Thus the only factual dispute in this case arises from the rankest type of inadmissible hearsay. Based on the Sheriff's deposition, the statement to the press was unreliable and inadmissible in evidence. No exception to the hearsay rule would let it in. Nonetheless, restrained as we are by Johnson, we must dismiss Jamerson's appeal because a factual dispute remains.
 
 
 24
 The judgment of the District Court is therefore affirmed as to all parties.
 
 CONCURRING IN PART, DISSENTING IN PART
 
 25
 MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.
 
 
 26
 Despite the "relative[ ] eas[e]" with which the majority is able to dispense with plaintiffs' claims against defendants Washington County, Johnson City, Sam Garland, and Billy Mitchell, my review of the record in this matter reveals genuine issues of material fact that remain to be resolved concerning actions and inactions by those defendants. Consequently, whileI concur in the majority's conclusion that we have no jurisdiction over defendant Jamerson's appeal at this time, I respectfully dissent from the remainder of the majority opinion.
 
 
 27
 Without question, the now-familiar 1986 trilogy of cases, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); and Celotex Corp. v. Catrett, 477 U.S. 317 (1986), "ushered in a 'new era' in the standards of review for a summary judgment motion" by lowering the movant's burden in such proceedings. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388 (6th Cir. 1993). Despite that relaxation, however, summary judgment remains improper unless no genuine issue of material fact exists in the case. Should such a dispute remain, faith in the jury system that undergirds American jurisprudence requires that the finders of fact be allowed to resolve the disagreement after hearing all relevant evidence.
 
 
 28
 In this case, the majority highlights selected facts from the record before us and, at one point in its analysis, concludes that "[b]ased on these facts . . . there is no evidence from which a reasonable jailor would have foreseen suicide." (Emphasis added.) With that statement, I cannot disagree. With the benefit of additional evidence included in the record but not mentioned in the majority opinion, however, I believe a reasonable jury could find in favor of the plaintiffs on the excessive force, deliberate indifference, and failure-to-train claims. Viewing the facts in the record and the inferences to be drawn from them in the light most favorable to the plaintiffs, as we are required to do, see, e.g., American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc., 185 F.3d 606, 619 (6th Cir. 1999), I believe reasonable jurors could conclude that the individual defendants had knowledge of Craig Lanthorn's need for medical treatment but were deliberately indifferent to that need. Moreover, evidence adduced by the plaintiffs was sufficient to enable a reasonable jury to question the adequacy of the defendant municipalities' training programs and to find that Officer Garland used excessive force in handling Lanthorn in the Johnson City jail.
 
 I.
 Deliberate Indifference Claim
 
 29
 We have recently reiterated that "summary judgment is inappropriate when there are issues of fact as to whether [a defendant in a § 1983/Eighth Amendment case] was aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and whether he actually dr[e]w the inference." Woods v. Lecureux, 110 F.3d 1215, 1224 (6th Cir. 1997) (quoting Street v. Corrections Corp. of Am., 102 F.3d 810, 816 (6th Cir. 1996)) (internal quotation marks and citations omitted). In this matter, almost from the inception of the defendants' contacts with Lanthorn shortly before his suicide, disturbing facts and occurrences presented themselves that could, in the estimation of a reasonable jury, support the plaintiffs' claims of obvious, imminent harm. After Lanthorn's arrest, for example, Officer Tim Hensley of the Johnson City Police Department noted that Lanthorn was foaming at the mouth.
 
 
 30
 Similarly, at the arrest scene, Dr. James Turnbull, the father of Sarah Lee, also noted that Lanthorn was foaming at the mouth and that Craig had mistakenly called Turnbull "Dr. Fenley," one of Lanthorn's physicians. Although Turnbull attributed Lanthorn's condition to drug use, he admits informing the police that the young man "obviously needs some medical attention." No such attention was forthcoming.
 
 
 31
 At the Johnson City jail, Lara Bolton processed Lanthorn's paperwork and noted that he suffered from anxiety and seizuresand that he was taking the prescription drug Klonopin. Despite those danger signals, however, Bolton did not inquire further into Lanthorn's need for medical treatment. A few hours later, Lanthorn began screaming and kicking at his cell door. Officer Garland responded to the disturbance and observed Lanthorn flailing on his back, complaining that he was having a seizure, and requesting transport to the hospital. That request was denied, however, and a rescue team was summoned. Although the paramedics did not deem Lanthorn's condition serious enough to require transport, a member of the team did write that Garland should contact Lanthorn's physician for additional instructions about medication. Garland did not do so.
 
 
 32
 The day following Lanthorn's arrest, the pretrial detainee was transferred to the Washington County jail for court proceedings. Officer Hensley again transported Lanthorn and, because of a conversation between the young man and other prisoners, he asked Lanthorn if he was contemplating suicide. Hensley testified that he made the inquiry based upon a feeling and Lanthorn's "high level of anxiety and upsetness." Because Lanthorn denied such thoughts, Hensley chose not to mention to Washington County jail officials the suicide talk, the bizarre behavior, the summoning of the rescue team, or Lanthorn's request for medical treatment.
 
 
 33
 Upon arriving at the Washington County facility, Lanthorn did explain to booking clerk Wanda Robertson that he was presently on medication for panic attacks, nerves, and seizures. Given that history and the prisoner's disoriented appearance, Robertson initially assigned Lanthorn to one of the county's suicide prevention cells. Lanthorn twice insisted, however, that he was not suicidal. Even though Robertson also overheard Lanthorn promise his mother that, upon his release, he would check into a psychiatric hospital, Robertson did not become overly concerned and, in fact, testified that she thought only that the prisoner had a drug or alcohol problem.
 
 
 34
 Before Lanthorn could be placed in the suicide watch cell, Officer Billy Mitchell heard Lanthorn's name being mentioned and recognized the prisoner as the individual Mitchell had transported to a Knoxville psychiatric hospital approximately one month earlier. Realizing that Lanthorn had required hospitalization on that prior occasion, Mitchell, at the direction of R.D. Jamerson, his immediate superior, engaged Lanthorn in conversation and later related that the prisoner claimed that he loved life and was preparing to care for an infant who would be born soon. Based upon that discussion, despite having seen Lanthorn distraught while speaking with his mother on the telephone, without reviewing an assessment of Lanthorn's condition and complaints, and without consulting the booking card, Mitchell recommended that Lanthorn be transferred from the previously-assigned suicide prevention cell to a less-frequently monitored cell.
 
 
 35
 Based upon these facts alone, a reasonable jury could conclude that Garland and Mitchell were deliberately indifferent to Lanthorn's need for medical treatment. Consequently, summary judgment should not have been granted to the defendants on this claim.
 
 II.
 Failure To Train Claim
 
 36
 Despite the shocking nature of the individual defendants' inattention to warning signs and the outright disregard of requests by Lanthorn for medical care, such inaction is understandable when presented with evidence from which a jury could find that the municipal defendants unconstitutionally failed to train their employees adequately to spot such dangerous situations. In fact, defendant Garland intimated during his deposition testimony that although his personnel file indicates that he received the required number of hours in suicideprevention training, Johnson City actually falsified those reports so as to permit certification without the requisite instruction. Additionally, although both Johnson City and Washington County maintained suicide prevention guidelines in their jail manuals, defendant Mitchell testified unequivocally that he had never seen the county's manual, despite employment in the jail facility.
 
 
 37
 Such evidence, if believed by a jury, would enable a plaintiff to establish a failure-to-train claim under the circumstances presented in this matter. The refusal of the district court and of the majority to permit examination of that evidence by a fact-finder thus justifies reversal of the summary judgment granted to the municipal defendants on plaintiffs' allegations.
 
 III.
 Excessive Force Claim
 
 38
 Similarly, the plaintiffs adduced proof that, if believed, would justify a jury in concluding that defendant Garland utilized excessive force in dealing with Lanthorn while Lanthorn claimed to be suffering from a seizure in the Johnson City jail. Deposition testimony established that while the pretrial detainee was flailing on the floor of a jail cell, Garland, who then weighed approximately 380 pounds, came into the cell and physically restrained the prisoner. Although Garland insists that he only placed his foot lightly on Lanthorn's leg between the ankle and shin in order to stop the thrashing, Lanthorn later claimed he had been beaten by Garland. Also, Dr. Cleland Blake testified in his deposition that his autopsy of the body of Craig Lanthorn revealed some bruising in the buttocks area "consistent" with a shoe print. Such divergent testimony again demands resolution, not in a ruling on a motion for summary judgment, but rather by a jury selected by the litigants to sift through the conflicting evidence.
 
 IV.
 
 39
 In upholding the district court's grant of summary judgment to the defendants in this case, the majority gives credence to the evidence adduced by the city and county employees. Furthermore, in concluding that no reasonable person could have envisioned Lanthorn's need for medical treatment, the majority relies heavily upon statements made by Lanthorn's mother, without a personal visitation of her incarcerated son, in a letter she wrote seeking assistance in contacting a psychic to aid her in unraveling the events of Craig's final hours. A jury, presented with all relevant information in this case, might well concur in the result reached by the majority. Other evidence, however, supports a determination that the plaintiffs' allegations are well-founded. In our judicial system, it is only the appointed finders of fact that should be allowed to make the necessary credibility findings and analyses necessary to sort through such conflicting testimony. Out of respect for that system, I dissent from that part of the majority's decision removing the jury from its pre-eminent fact-finding role.