# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3812

TIMOTHY MCKINNEY, individually and as personal
representative of the Estate of Michael McKinney,
deceased, and LISA MCKINNEY, individually,

*Plaintiffs-Appellees*,

*v.*

ROBERT DUPLAIN, in his individual capacity,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 C 294—**Richard L. Young**, *Judge.*

ARGUED APRIL 6, 2006 —DECIDED SEPTEMBER 12, 2006

Before RIPPLE, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.*  Michael McKinney's father,
Timothy McKinney, as representative of Michael's estate,
sued Officer Duplain under 42 U.S.C. § 1983, alleging a
claim of excessive force after Officer Duplain shot and killed
Michael while responding to a 911 burglary-in-progress call.
Officer Duplain moved for summary judgment based on
qualified immunity. The district court denied the motion

and Officer Duplain appeals. We dismiss for lack of jurisdiction.

## I.

On Saturday night, November 7, 2003, 21-year-old Ball State University student Michael McKinney went out drinking with some college friends. McKinney stayed out until closing time, leaving the last bar he had visited at 3:00 a.m. At approximately 3:15 a.m., another student, Brent Archambault, saw McKinney intoxicated and crawling on his hands and knees on North Street—a street near campus in an area called "The Village." McKinney eventually worked himself up into a sitting position, leaning against a tree. Archambault approached McKinney, asked if he needed any help, and offered him a ride home. McKinney told Archambault to leave him alone, indicating that he was already at his house. In fact, McKinney was not at home, but rather in front of the house of widow Jane Poole. One of McKinney's friends, Phil Justevice, later surmised that McKinney thought he was at Justevice's house, which was down the block.

A little while later McKinney made his way from the front yard to the back of Poole's home. McKinney then began banging on her patio door, pulling the door trying to gain entry. Poole heard the noise, went downstairs, flipped on the outside light and peeked through the blinds on the sliding glass door. There she saw McKinney, whom she later described as "a skinhead, fairly big looking guy." McKinney continued to pound on the door and pull on the handle, seeking entry. Not recognizing McKinney and fearing for her safety, Poole called Delaware County 911. The call came in at approximately 3:26 a.m., and a recording captured the following exchange:

911: 911, what's your emergency?

Poole: Hurry, someone's pounding, a man's pounding on my back door.

911: What's your address?

Poole: 1325 W[est] North Street. He's at the back door, he's pounding really hard.

911: Okay. Do you know who it is?

Poole: No, no!

911: Okay, what's your phone number?

Poole: 482-7613

911: Are you expecting anybody?

Poole: No, no!

911: What's your name?

Poole: Jane Poole. Please hurry!

911: Okay, we're on the way, ma'am. Do you know what he looks like?

Poole: No!

911: Okay, do you know if it's a male or not?

Poole: Yes, yes. He had no hair, white, very white.

911: Is he still there?

Poole: Yes, he's been pounding.

911: Is he saying anything?

Poole: No! He's just trying to get in, please!

911: We're on the way, ma'am. How long has he been there? Hello? She just hung up on me.

Unbeknownst to the 911 operator, Poole had hung up to call her neighbors, Mike and Nancy Ellis. Poole told Mike Ellis about the situation, but told him not to come over as she had already called the police. The Ellises then went to a second-story bedroom window which overlooked Poole's backyard. From there, Mike Ellis saw McKinney move away from Poole's deck and toward a tree in the backyard. Mike Ellis noticed McKinney stumble and testified that he appeared intoxicated. Nancy Ellis also described McKinney as "very wobbly."

Based on the 911 call, the Muncie Police Department ("MPD") dispatched officers to "1325 W[est] North on a burglary in progress." A few moments later, the MPD dispatcher reported an "emergency at 1325 West North," and then "[f]emale advised there was a subject pounding at the door. It was a white male with no hair. He's still pounding at the back door. Female subject just hung up on us. Trying to make contact back. All units unable to make contact back to female."

The MPD dispatched four officers—25% of its total available force—to Poole's home. Additionally, the MPD requested the assistance of the Ball State University Police Department ("BSUPD"). Because of the close proximity of their patrol areas, BSUPD continually monitors MPD dispatches. Four BSUPD officers responded to the dispatch: Officers Robert Duplain, Matt Gaither, and Eric Perkins and their shift supervisor, Corporal David Bell.

The four BSUPD officers, driving separate vehicles, arrived at Poole's residence between 3:26 a.m. and 3:27 a.m. After arriving, Corporal Bell and Officer Perkins walked up the east side of the house with their weapons drawn and Officer Gaither went to check the front of the house. Officer

Duplain, seeing the other areas covered, approached the backyard from the west side of the house.

As they approached Poole's backyard from the east side, Corporal Bell and Officer Perkins discovered their access blocked by a six-foot-tall wooden fence that ran from the southeast corner of Poole's house, curved around the backyard, and then joined a detached garage on the south side. At the same time, Officer Duplain made his way down a rough, narrow stone walkway along the west side of the house. Like his fellow officers, Officer Duplain had also drawn his service weapon.

When Officer Duplain entered the backyard, he saw McKinney standing under a tree approximately ten to twenty feet away. The parties dispute what happened next. Officer Duplain explained that after entering the backyard, he began shouting commands at McKinney, although the various witnesses heard different things. Officer Duplain remembers saying: "Police. Show me your hands. Get on the ground. Get the f—on the ground. Get on the ground now." Mike Ellis heard only the words "Hey hey" and possibly, "Stop right there." Nancy Ellis remembered "Hey, hey." Poole heard "Hey." Corporal Bell remembered hearing shouts similar to what "you would hear a police officer shout to someone . . . it sounded like lawful verbal orders, 'Stop. Get on the ground.'" Officer Perkins heard Officer Duplain say "Get on the ground. Get on the ground. . . [and] a couple, Get the f—on the ground," as well as "Police."

While the witnesses all heard different commands, the Ellises both testified that, from their vantage point next door, they were able to recognize Officer Duplain as a police officer. Specifically, Mike Ellis testified that he observed Officer Duplain wearing a dark uniform, and Nancy Ellis

noticed an insignia on Duplain's shoulder. Additionally, the neighbor to the east of Poole's house, Donna Winters, stated that she likewise recognized the individuals approaching the backyard as police officers.

Officer Duplain further testified that while he was shouting commands to McKinney, McKinney showed no signs of intoxication, but instead turned toward Officer Duplain until he was "squared up." Officer Duplain explained that this took two or three seconds and that then McKinney suddenly charged him. Officer Duplain stated that he thought he would have to fight McKinney if McKinney reached him. According to Officer Duplain, he feared that McKinney had a weapon or would try to take his weapon. Officer Duplain testified that he feared for his life, as well as for the safety of the other officers and Poole. Officer Duplain explained that when McKinney came within a few feet of him, he fired his service weapon. As McKinney continued to advance, Officer Duplain fired again.

An autopsy later revealed that Officer Duplain shot McKinney four times: (1) an entrance gunshot wound just below the left eye; (2) an entrance gunshot wound to the left chest that pierced the left and right ventricles of the heart; (3) an entrance gunshot wound to the left shoulder that shattered the humerus bone; and (4) an entrance gunshot wound to the left lateral chest. The autopsy further established that the four bullets entered McKinney's body at a downward angle from the horizontal plane, and toxicology results showed that McKinney's blood alcohol level was .343.

The Ellises witnessed the shooting, and both testified that Officer Duplain did not fire his weapon until a few seconds after McKinney charged, and not until McKinney came

within a few feet of Officer Duplain. Mike Ellis stated that McKinney "was running at the officer." Nancy Ellis observed McKinney "running. He came forward very assertively, very quickly toward the police officer." According to Nancy Ellis, McKinney "leaped toward the officer. He charged toward the officer." Mike Ellis also observed McKinney "lunging toward the officer" with his left arm out as he got near.

After hearing the shots, Corporal Bell kicked in the gate at the south side of Poole's backyard, entering the backyard between three to five seconds after the shots were fired. He saw Officer Duplain standing upright near the west edge of the concrete patio, with McKinney laying on his side about three to four feet away. Corporal Bell turned McKinney on his back and performed CPR until medical assistance arrived. The MPD officers had also arrived by this time and by agreement MPD took over the investigation of the shooting. McKinney was later pronounced dead at Ball Memorial Hospital.

A little over three months later, on February 10, 2004, McKinney's father, Timothy McKinney, as personal representative of his estate, and McKinney's parents, in their own capacities, filed a two-count complaint against Officer Duplain and Ball State Director of Public Safety, Gene Burton. The McKinneys sued the defendants in their individual and official capacities. Count I of the complaint alleged an excessive force claim under 42 U.S.C. § 1983 against Officer Duplain, and Count II asserted a § 1983 claim against Burton, for allegedly creating and maintaining policies at Ball State University that exhibited deliberate indifference to the constitutional rights of persons at Ball State University. The district court granted the defendants' motion to dismiss the official capacity claims as barred by the Eleventh Amendment.

Officer Duplain and Director Burton then filed motions for summary judgment on the individual capacity claims, asserting the defense of qualified immunity. In opposing Officer Duplain's motion for summary judgment, McKinney proffered testimony from several experts. Based on these reports, the Estate argued that McKinney did not charge Officer Duplain, but instead "McKinney was shot twice from the back left side while he was standing still. Then, after he turned and started to fall in the direction of Duplain, he was shot two more times while he was close to the ground." The district court granted Director Burton's motion and denied Officer Duplain's motion. The district court later granted Officer Duplain's motion to dismiss Michael's parents' § 1983 claims (the claims they brought in their own capacities, as opposed to in a representative capacity on behalf of Michael). Officer Duplain appeals from the denial of his motion for summary judgment.[1]

## II.

On appeal, Officer Duplain argues that he is entitled to qualified immunity and that the district court erred in denying his motion for summary judgment on McKinney's § 1983 claim. Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes

---

[1] The only issue on appeal is Officer Duplain's right to summary judgment based on qualified immunity. The McKinneys do not seek review of the district court's Eleventh Amendment ruling, its ruling as to Director Burton, or the dismissal of the claims they brought in their own capacities.

> to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. Thus, to state a claim for relief under § 1983, plaintiffs "must allege: (1) they were deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was visited upon them by a person or persons acting under color of state law." *Jones v. Wilhelm*, 425 F.3d 455, 465 (7th Cir. 2005).

In its complaint, the Estate alleged that Officer Duplain, while acting under color of state law, violated McKinney's constitutional rights by shooting and killing him. Officer Duplain contends that he is entitled to qualified immunity for his actions. "The doctrine of qualified immunity shields government officials against suits arising out of their exercise of discretionary functions 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Jones*, 425 F.3d at 460 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), summarized the two-part test for qualified immunity. "First, a court must decide whether the facts, when viewed in the light most favorable to the plaintiff, indicate that the officer's conduct violated some constitutional right of the plaintiff." *Jones*, 425 F.3d at 460 (citing *Saucier*, 533 U.S. at 201). If so, the "court must determine whether the constitutional right violated was 'clearly established' at the time of the alleged violation." *Jones*, 425 F.3d at 460 (quoting *Saucier*, 533 U.S. at 201). "Unless the answer to both questions is

'yes,' " a government official is entitled to qualified immunity. *Jones*, 425 F.3d at 460.

The first question, then, is whether Officer Duplain's shooting of McKinney violated "some constitutional right." *Id.* It is well established that "[a] police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). Deadly force is reasonable if a law enforcement officer "has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, warns the suspect before firing." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). Thus, "when an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Id.* (emphasis deleted). Moreover, "[t]he particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Additionally, the Supreme Court has instructed that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Officer Duplain argues that he is entitled to qualified immunity because, given the totality of the circumstances, it was objectively reasonable for him to use deadly force against McKinney once McKinney charged him. Specifically, Officer Duplain points to the fact that dispatch had

reported a burglary-in-progress, in which 911 had lost contact with the caller. Officer Duplain further notes that many burglars are armed and that losing contact with a caller indicates that an intruder may have entered the house and attacked the victim. Although that was not the case here, Officer Duplain did not know that Poole had hung up to call her neighbors. Additionally, Officer Duplain points to the number of responding units, showing how seriously both the MPD and the BSUPD took the call. Finally, Officer Duplain argues that once McKinney charged him, he had no choice but to fire, as a hedge prevented him from moving backwards, and he was separated by a fence from other officers. Officer Duplain explains that he did not know that McKinney was unarmed and that even if he had known, he feared that if McKinney reached him, McKinney may have turned his service weapon against him.

McKinney counters that this court lacks jurisdiction to consider whether Officer Duplain acted reasonably in using deadly force. Generally speaking, 28 U.S.C. § 1291 does not confer jurisdiction to review a district court's denial of summary judgment. *See Jones*, 425 F.3d at 466. "However, an exception to this rule comes into play when a movant requests summary judgment based on qualified immunity." *Id.* In that circumstance, "[u]nder the collateral order doctrine the district court's denial of [a] motion for summary judgment based on qualified immunity is an immediately appealable 'final decision' within the meaning of 28 U.S.C. § 1291 to the extent that it turns on legal rather than factual questions." *Wernsing v. Thompson*, 423 F.3d 732, 741 (7th Cir. 2005). A defendant, though, "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).

McKinney claims that, under *Johnson*, this court lacks jurisdiction to hear Officer Duplain's appeal because the district court denied Officer Duplain summary judgment based on its conclusion that genuine issues of material fact exist. In support of his position, McKinney points to the district court's order which concludes:

> There are genuine issues of material fact as to whether it was objectively reasonable for Officer Duplain to use deadly force during his encounter with Michael on November 8, 2003. First, there is an issue of fact as to whether it was reasonable for Officer Duplain to believe that the situation he encountered posed a threat of serious physical harm to him or to others. The evidence reflects that the officers were alerted to the fact that a man was knocking on Poole's back door in an attempt to enter her residence. Further, Poole prematurely hung up during her 911 call, alerting dispatch to the fact that the situation may have escalated. There is also evidence to show, however, that Poole lived near The Village, an area of the Ball State campus known for its bars. Thus, it was not uncommon for intoxicated college students to frequent her neighborhood at late hours. Nor was it unusual for the BSUP[D] to receive calls involving intoxicated individuals, particularly on Saturday nights while Ball State was in session. Sergeant Rhonda Clark testified that 75-80% of the calls that BSUP[D] receives concern intoxicated college students. Second, there is conflicting evidence as to whether Officer Duplain sufficiently alerted Michael to his presence on the scene. . . . Officer Duplain remembers saying, "Police. Show me your hands. Get on the ground. Get the f—on the ground. Get on the ground now." Mike Ellis, who watched the encounter take place from his second floor bedroom, heard him say, "hey, hey" and possibly "stop

right there." Poole, behind her patio doors, only heard the word "hey." Third, Officer Duplain testified that he shot at Michael as he charged toward him. This fact is contradicted by the forensic evidence submitted by Plaintiffs. Indeed, there is even conflicting evidence on the sequence of the shots fired. Finally, there is an issue of fact as to whether the number of shots fired was reasonable under the circumstances.

Officer Duplain concedes that the district court concluded that there were four genuine issues of material fact but argues "[t]hree of the four disputed issues identified by the Court are clear questions of law," and that on the fourth issue, the district court erred in considering the proffered expert opinions without applying *Daubert*. Under *Johnson*, "[t]he dividing line that separates an immediately appealable order from a nonappealable one in these purlieus is not always easy to visualize." *Diaz v. Martinez*, 112 F.3d 1, 3 (1st Cir. 1997). Therefore, before considering Officer Duplain's arguments, we begin with a review of the *Johnson* decision.

In *Johnson*, the plaintiff, Houston Jones, sued several policemen, claiming the officers used excessive force when they arrested him and later beat him at the police station. *Johnson*, 515 U.S. at 307. Five officers arrested Jones or were present when he was booked. The arresting officers had found Jones lying on the street; the officers thought Jones was drunk, but, in reality, he had suffered an insulin seizure. *Id.* When Jones came to, he was in a hospital with several broken ribs. *Id.* Three of the officers moved for summary judgment, arguing that Jones failed to present sufficient evidence that they had either beaten him or been present when others had done so. *Id.* Jones responded by pointing to his own deposition testimony in which he swore

that officers (although he did not identify which ones) had used excessive force when arresting him and later at the police station. *Id.* Jones further pointed to the depositions of the three officers, all of whom admitted they were present at the arrest and in or near the booking room when Jones was there. *Id.* at 307-08. The district court concluded that this evidence was sufficient to create a genuine issue of fact as to whether the three officers stood by and watched the beating, and if they had done so, that was sufficient to create liability. *Id.* at 308. The officers appealed, arguing that "the denial was wrong because the record contained not a scintilla of evidence . . . that one or more of them had ever struck, punched or kicked the plaintiff, or ever observed anyone doing so." *Id.* (internal quotations omitted). This court refused to consider the officers' argument, holding that we lacked appellate jurisdiction to determine whether the record contained sufficient evidence to raise a "genuine" issue of fact for trial. The officers appealed to the Supreme Court. The Supreme Court in *Johnson* affirmed, holding "that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319.

The Supreme Court later clarified the scope of *Johnson* in *Behrens v. Pelletier*, 516 U.S. 299 (1996). In *Behrens*, the Court explained that "*Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable." *Id.* at 313 (emphasis in original). Rather, the Court explained, "*Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than wheth-

er the evidence could support a finding that particular conduct occurred, the question decided is not truly 'separable' from the plaintiff's claim, and hence there is no 'final decision.' . . ." *Id.* However, the *Behrens* Court stressed that "*Johnson* reaffirmed that summary judgment determinations *are* appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity, typically, the issue whether the federal right allegedly infringed was clearly established . . . ." *Id.* (quoting *Johnson*, 515 U.S. at 317). The Court in *Behrens* further emphasized that "*Johnson* permits petitioner to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the [qualified immunity] standard of objective legal reasonableness*." Id.*

This court considered the scope of *Johnson* in *Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005). In *Leaf*, members of John Leaf's family sued, among others, two sheriff's deputies, alleging they unlawfully searched Leaf's apartment, unlawfully seized him, denied Leaf life, liberty and property without due process of law, and that Deputy Shelnutt had used excessive force against Leaf. *Id.* at 1075-76. The claims all stemmed from an early morning incident on May 5, 2001, when John Leaf returned home from a night of drinking. *Id*. at 1074. He had turned over his keys to a friend and taken a taxicab home to his apartment at Lake Nora Arms Apartments. *Id.* In addition to his car keys, Leaf had given his friend his apartment key and thus had to force his way into his own apartment. *Id.* Neighbors heard the glass breaking and went to investigate. Leaf introduced himself to the other tenants and explained that he lived in the apartment but did not have his keys. *Id.* None of the other tenants had met Leaf before that evening. *Id.* After talking briefly with Leaf, they returned to their own apartments. *Id.*

They later called 911, but hung up before the call was answered. *Id.* Deputy Jacobs responded to the incomplete 911 call. *Id.* When he arrived about 1:20 a.m., the neighbors explained that they had seen a man breaking a window to enter an apartment but that he had claimed to be the occupant of the apartment and that he did not have his keys. *Id.* Deputy Jacobs then went to Leaf's apartment, saw the patio door open, a rear window broken, and something pushed up against the front door. *Id.* After backup arrived, Deputies Jacobs and Shelnutt entered the apartment with their guns drawn. *Id.* at 1075. "The officers searched the apartment, including the bedroom, where they found Mr. Leaf lying naked and uncovered on his bed, face up, with his eyes closed. Mr. Leaf was breathing deeply." *Id.* While Deputy Jacobs stayed in the bedroom watching Leaf, Deputy Shelnutt searched the remainder of the apartment. *Id.* After confirming that no one was hiding in the apartment, Deputy Shelnutt approached Leaf with his gun drawn. *Id.* Deputy Shelnutt woke Leaf up, and, according to the officers, at this point, "Leaf jumped up from the bed and lunged at Deputy Shelnutt, wielding a 15-inch [B]owie knife." *Id.* The officers told Mr. Leaf to drop the knife and shouted, "Sheriff's Department" or "Police." *Id.* Leaf, however, advanced toward Deputy Shelnutt with the knife. *Id.* After retreating a step or two, Deputy Shelnutt then fired four shots, hitting Leaf three times. *Id.* Leaf died from the gunshot wounds. *Id.*

As noted, Leaf's family sued (among other officials) Deputies Shelnutt and Jacobs, although they later settled with Deputy Jacobs. *Id.* at 1076. Deputy Shelnutt moved for summary judgment, arguing that he was entitled to qualified immunity. *Id.* The district court denied Deputy Shelnutt's motion in part, and Deputy Shelnutt appealed. *Id.*

at 1077 n.3. On appeal, this court summarized the district court's ruling, explaining:

The district court denied Deputy Shelnutt qualified immunity because it found that questions of fact existed respecting four actions that he took on May 5, 2001: (1) his entry into Mr. Leaf's apartment; (2) his subsequent search of Mr. Leaf's apartment; (3) his conduct toward Mr. Leaf while Mr. Leaf was lying on the bed; and (4) the manner in which he shot Mr. Leaf. The district court also denied Deputy Shelnutt qualified immunity for the excessive force claim on the ground that, because the first three actions listed may have violated Mr. Leaf's constitutional rights, Deputy Shelnutt may have created the need for force in such a way that his ultimate shooting of Mr. Leaf was tainted by prior unconstitutional acts.

*Id.* at 1080-81 (internal quotations omitted).

In summarizing the Supreme Court's holding in *Johnson*, in *Leaf* we noted that we "may not reconsider the district court's determination that certain genuine issues of fact exist. . . . Thus, we may not make conclusions about which facts the parties ultimately might be able to establish at trial." *Id.* at 1078. We further explained that "[s]uch conclusions concern the 'sufficiency of the evidence' and are not properly before a court of appeals considering the denial of qualified immunity." *Id.* Conversely, we stressed, "when the outcome of a question of law—for instance, whether a particular action violates the Constitution—does not depend on the outcome of a disputed factual question, we may review whether the district court correctly determined the question of law that it considered." *Id.* As we explained, under *Johnson*, these "are the 'more abstract issues of law' to which an appeal of the denial of qualified immunity properly is limited. When conducting such a review, we

simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Id.* (quoting *Johnson*, 515 U.S. at 317, 319).

Notwithstanding the limitations of *Johnson*, we determined in *Leaf* that we had jurisdiction to consider Deputy Shelnutt's appeal. Although the district court in *Leaf* characterized the questions as factual questions, this court concluded that the real question was whether, taking the facts as assumed by the district court, Deputy Shelnutt's actions violated the Constitution. *Id.* at 1081-82; 1085; 1088; 1091-93. This question of law was within our jurisdiction. We then held that, as to each claim Deputy Shelnutt challenged on appeal,[2] the facts failed to establish a constitutional violation and therefore Deputy Shelnutt was entitled to qualified immunity. *Id.* at 1081-82; 1085; 1088; 1091-93.

Officer Duplain similarly argues that although the district court characterized the issues as factual questions, he is not challenging the facts as assumed by the district court but rather whether those facts violate clearly established constitutional principles. First, Officer Duplain points to the district court's conclusion that a genuine issue of material fact existed as to whether he "believe[d] that the situation he encountered posed a threat of serious physical harm to him or to others." The district court reached this conclusion based on evidence that intoxicated college students often frequented Poole's neighborhood late at night. The district court likewise relied on evidence that on Saturday nights

---

[2] Deputy Shelnutt did not argue on appeal that he was entitled to qualified immunity on the excessive force claim because he acted reasonably in shooting Leaf. *Id.* at 1092.

while Ball State was in session, 75-80% of the calls that the BSUPD received concerned drunk students.[3] Officer Duplain stresses that on appeal he is not challenging those facts but rather is making a purely legal argument—that taking the facts as assumed by the district court, his conduct did not violate the Constitution. Next, Officer Duplain points to the second genuine issue of material fact found by the district court, namely "whether Officer Duplain sufficiently alerted Michael to his presence on the scene." Although the evidence conflicted as to what exactly Officer Duplain said when he confronted McKinney in the backyard, Officer Duplain argues on appeal that he is willing to assume that the most he said was "Hey." Nonetheless, Officer Duplain argues he is entitled to qualified immunity because the evidence shows that the backyard was well-lit and that neighbors who were much further away from Officer Duplain than McKinney recognized Officer Duplain as a police officer. The district court also held that there was "an issue of fact as to whether the number of shots fired was reasonable under the circumstances." Officer Duplain again argues that he is not challenging any factual finding but rather is arguing the purely legal question of whether shooting a charging suspect four times violates clearly established constitutional principles.

---

[3] It is unclear why the district court found this evidence relevant since the call was made to the Delaware County 911 and not to the BSUPD. What percentage of calls to 911 involved intoxicated students is unclear, although it is likely a much lower percentage given that 50% of off-campus calls concern intoxicated students, and thus 50% involve some other disturbance or crime. More importantly, the dispatcher reported a burglary-in-progress and not an incident involving a student.

If these were the only genuine issues of material fact the district court found to exist, we would agree with Officer Duplain that jurisdiction would be proper. As the Supreme Court explained in *Behrens*, "*Johnson* reaffirmed that summary judgment determinations are appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity, [515 U.S.] at 317, typically, the issue whether the federal right allegedly infringed was clearly established, . . ." *Behrens*, 516 U.S. at 313. *Leaf* similarly held that "when the outcome of a question of law—for instance, whether a particular action violates the Constitution—does not depend on the outcome of a disputed factual question, we may review whether the district court correctly determined the question of law that it considered." *Leaf*, 400 F.3d at 1078. And as in *Leaf*, with respect to the above three issues, Officer Duplain does not challenge the factual assumptions, but rather seeks review of the district court's conclusion that the assumed facts could violate clearly established constitutional principles.

However, in denying Officer Duplain summary judgment, the district court found a fourth genuine factual issue, namely that while "Officer Duplain testified that he shot at McKinney as he charged toward him [t]his fact is contradicted by the forensic evidence submitted by Plaintiffs." As to this fourth issue, Officer Duplain does not argue that he was legally entitled to shoot McKinney whether or not McKinney charged him. Rather, Officer Duplain argues that there was no admissible evidence that McKinney had not charged him, because the experts' testimony the district court relied upon was inadmissible under *Daubert*. On appeal, Officer Duplain then spends a great deal of time in his brief arguing the facts; he highlights the eyewitness testimony—all of which confirmed Officer Duplain's testimony that McKinney charged Officer Duplain before he

fired. Officer Duplain then dissects the various testimony
from the experts, pointing out many flaws in their opinions.
For instance, Officer Duplain complains that none of
McKinney's experts asserted that they believed "to a
reasonable degree of scientific certainty" that McKinney had
not charged Duplain. Rather, Officer Duplain notes that the
experts used phrases such as "possible" or "more probable."
Additionally, Officer Duplain contends that the opinions
failed to take into account all of the physical evidence. For
example, one expert stated that McKinney was shot while
still at the tree, but Officer Duplain argues that this conclu-
sion cannot possibly be true because the tree was on a
mound that raised it nearly a foot higher than the patio area
from where Officer Duplain had shot McKinney, and the
autopsy report stated that the bullets all entered McKinney
at a downward angle. That same expert stated that Officer
Duplain then moved the body to near the patio, but Officer
Duplain claims that the evidence showed that there were no
blood stains by the tree.[4] Additionally, Officer Duplain
points to the fact that the shell casings were recovered
from the right and rear of where he and the witnesses said
he stood, not near the tree. Moreover, Officer Duplain
argues that the experts testified inconsistently that
McKinney never charged Officer Duplain, but that the
initial shots were fired when McKinney was more than
five feet away, but the final shot was within six inches. Were
we to review the record and confirm these numer-

---

[4] On appeal, McKinney argues that the physical evidence
supports his experts' conclusion, pointing to photographs of the
jacket McKinney was wearing to show the entry points of the
bullets. Clothing, however, is moveable, and thus any reliance on
the jacket, as opposed to the autopsied body which showed the
entry wounds, is misplaced.

ous problems with the experts' opinions, we would have great difficulty in finding them admissible under *Daubert*.

However, given the mandate of *Johnson*, we lack jurisdiction to conduct such a review of the record. As *Johnson* made clear, a defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319-20. Yet that is exactly what Officer Duplain is seeking to do: Officer Duplain maintains that the record does not support the district court's conclusion that a genuine issue of fact exists as to whether McKinney charged Officer Duplain, because the only evidence that supports the view that McKinney did not charge comes from the inadmissible opinions of the proffered experts. *See Appellant's Brief* at 48 ("The fourth issue, that Duplain's testimony 'is contradicted by the forensic evidence submitted by the Plaintiffs,' does not present a material dispute, because the evidence was speculative on its face."). Thus, under *Johnson*, we lack jurisdiction to consider Officer Duplain's appeal. *Johnson*, 515 U.S. at 319-20; *see also Behrens*, 516 U.S. at 313 (explaining that "if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly separable from the plaintiff's claim, and hence there is no final decision . . .").

The Sixth Circuit reached the same conclusion in *Ellis v. Washington County and Johnson City, Tenn.*, 198 F.3d 225 (6th Cir. 1999). In *Ellis*, the mother and minor child of a pretrial detainee sued under § 1983 after the detainee committed suicide in the county jail. *Id.* at 226. Relevant for our purposes is the claim against one of the jailors, defendant R.D. Jamerson. Jamerson moved for summary judgment based on qualified immunity. The district court denied

Jamerson's motion and Jamerson appealed. *Id.* On appeal, Jamerson argued that he was entitled to summary judgment because the only evidence that could possibly create liability on his part was inadmissible hearsay evidence. The Sixth Circuit quite concisely framed the issue: "The question then comes down to this: In a qualified immunity appeal by a state official, should the court of appeals look behind a *Johnson v. Jones* type factual dispute to determine if the factual dispute is based only on uncorroborated hearsay that will not be admissible at trial[?]" *Id.* at 229. The Sixth Circuit then stressed that the "court below declined to grant Jamerson's motion for summary judgment because, and only because, of Sheriff England's hearsay statements." *Id.* The Sixth Circuit then went so far as to say that "the only factual dispute in this case arises from the rankest type of inadmissible hearsay." *Id.* Yet, the Sixth Circuit explained that "restrained as we are by *Johnson*, we must dismiss Jamerson's appeal because a factual dispute remains." *Id.*

We are likewise constrained by *Johnson* and thus, notwithstanding the numerous problems with the proffered experts' opinions that Officer Duplain identifies, we must dismiss Officer Duplain's appeal for lack of jurisdiction. It is true, as Officer Duplain stresses, that the defense of qualified immunity is not just a defense to liability, but it also entitles a defendant not to stand trial. *Leaf*, 400 F.3d at 1080. Officer Duplain also correctly notes that the issue of qualified immunity "should be resolved at the earliest possible stage in the litigation." *Bleavins v. Bartels*, 326 F.3d 887, 891 (7th Cir. 2003). However, the Supreme Court in *Johnson*, while acknowledging those principles, nonetheless concluded that other policy concerns outweighed the need for an immediate appeal. *See Johnson*, 515 U.S. at 317-18 (noting that "the countervailing considerations that we have mentioned (precedent, fidelity to statute, and underlying policies) are too strong to permit" an immediate appeal). Specifically, the

Court in *Johnson* reasoned that "the existence or nonexistence of a triable issue of fact . . . is the kind of issue that trial judges, not appellate judges, confront almost daily." *Id*. at 316. Additionally, "questions about whether or not a record demonstrates a 'genuine' issue of fact for trial, if appealable, can consume inordinate amounts of appellate time. . . . To resolve those controversies—to determine whether there is or is not a triable issue of fact about such a matter—may require reading a vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials. This fact means . . . greater delay." *Id.* Finally, the Supreme Court noted that "the close connection between this kind of issue and the factual matter that will likely surface at trial means that the appellate court, in the many instances . . . may well be faced with approximately the same factual issue again, after trial, . . . [which would] require it, once again, to canvass the record." *Id.* at 316-17. Thus, "an interlocutory appeal concerning this kind of issue in a sense makes unwise use of appellate courts' time, by forcing them to decide in the context of a less developed record, an issue very similar to one they may well decide anyway later, on a record that will permit a better decision." *Id.* at 317.

Although in some cases, the same factors that the Supreme Court in *Johnson* believed weighed against immediate appeal, might instead cut the other way—for instance, where the district court's mistake seems obvious—the Court in *Johnson* stressed that it must "of course decide appealability for categories of orders rather than individual orders." *Id.* at 315. Accordingly, we cannot, in each individual case, "engage in ad hoc balancing to decide issues of appealability." *Id.* Therefore, even though in this case a holding that we lack jurisdiction may problematically prolong this case, under *Johnson* that is our only option. However, before this case proceeds further, we

would encourage the district court to consider in more detail its reliance on the proffered experts' opinions. It is unclear from the district court's opinion if it even applied the *Daubert* framework. That, of course, is the required starting point. *See Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (holding that in reviewing the district court's decision concerning expert testimony, we must first determine whether the district court properly followed the framework set forth in *Daubert*). Nonetheless, under *Johnson*, our review of any ruling under *Daubert* cannot proceed at this time.[5]

Alternatively, Officer Duplain argues that this court has pendent appellate jurisdiction to consider his *Daubert* challenge. The Supreme Court in *Swint v. Chambers County Community*, 514 U.S. 35, 51 (1995), "set out a general rule against exercising pendent jurisdiction over related rulings but left open the possibility that appellate courts could extend such jurisdiction if the rulings were 'inextricably intertwined.' " *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092 (9th Cir. 1998) (citing *Swint*, 514 U.S. at 51). Thus, "the doctrine of pendent appellate jurisdiction . . . allows a court of appeals 'to review an otherwise unappealable interlocutory order if it is inextricably intertwined with an appealable one.' " *Montano v. City of Chicago*, 375 F.3d 593,

---

[5] Because this court lacks interlocutory jurisdiction in qualified immunity cases to consider evidentiary challenges, we stress that district courts should thoroughly consider challenges to the admissibility of evidence before ruling on summary judgment motions, as "when acting on a motion for summary judgment, the judge [should] consider[ ] only evidence that would be admissible at trial." *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845 (7th Cir. 1992).

599 (7th Cir. 2004) (quoting *Jones v. InfoCure, Corp.*, 310 F.3d 529, 536 (7th Cir. 2002)).

To establish pendent appellate jurisdiction, however, Officer Duplain must first establish at least one appealable order, because without an underlying "appealable" order, there can be nothing pendent. *See Montano*, 375 F.3d at 599 (holding that pendent jurisdiction allows review of an unappealable order "if it is inextricably intertwined with *an appealable one*") (internal quotation omitted) (emphasis added). Yet, we have already determined that McKinney's excessive force claim is not appealable because the district court concluded that a genuine issue of material fact existed as to whether McKinney charged Officer Duplain. Now, it is true, as we stressed in *Leaf*, that "[a] defendant may appeal the denial of qualified immunity with respect to particular claims even when he still will be required to go to trial on a matter separate from the claims for which he asserted qualified immunity." *Leaf*, 400 F.3d at 1078. Thus, if a plaintiff "seeks relief for a single incident on multiple theories of liability, . . . the defendant does not lose his right to appeal the denial of qualified immunity as to one theory of liability even when he still will be required to go to trial on another theory." *Id.* at 1078-79. Here, however, although McKinney attempts to present several distinct issues on appeal, those issues all relate to the same underlying excessive force claim. For instance, McKinney focuses on how Officer Duplain identified himself (or failed to do so), but this, by itself, does not present an independent basis for liability. Likewise, the high incidence of intoxicated college students in the Village do not present an independent constitutional claim. Rather, these facts relate to the totality of the circumstances underlying McKinney's excessive force claim. This scenario contrasts with *Leaf*, in which the plaintiffs had alleged numerous distinct claims, including

an unconstitutional entry, unconstitutional search, unconstitutional seizure, and unconstitutional shooting. *Leaf*, 400 F.3d at 1076. The final two aspects of McKinney's excessive force claim could, plausibly, be read as two distinct theories of liability: First, that Officer Duplain violated the Fourth Amendment by shooting McKinney, even once, and second, that Officer Duplain violated the Fourth Amendment by shooting McKinney multiple times. As noted, however, the district court found that a genuine issue of material fact existed as to whether McKinney charged Officer Duplain. This factual dispute is relevant to both potential excessive force theories and, therefore, we lack jurisdiction to consider either theory of liability. In short, then, none of the claims that McKinney presents is within our jurisdiction. Accordingly, there is no appealable claim on which a pendent claim could attach. Therefore, we do not have pendent appellate jurisdiction to consider Duplain's evidentiary challenge to the experts' opinions.

### III.

The district court denied Officer Duplain's motion for summary judgment based, in part, on its belief that a genuine issue of material fact existed as to whether McKinney had charged Officer Duplain. Although that conclusion rested on the district court's reliance on several problematic expert opinions, under the Supreme Court's holding in *Johnson*, this court lacks jurisdiction to review the district court's conclusion that a genuine factual dispute exists. Therefore, we must DISMISS for lack of jurisdiction.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*